641 A.2d 899

# DEPARTMENT OF HEALTH AND MENTAL HYGIENE

v.

## Carl M. SHRIEVES.

No. 1719, Sept. Term, 1993.

Court of Special Appeals of Maryland.

May 31, 1994.

284

David R. Morgan, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellant.

Barry C. Steel, Towson, for appellee.

Argued before BISHOP, DAVIS and MOTZ, JJ.

MOTZ, Judge.

The Secretary of Personnel's designee (SOPD) determined that a state employee should be terminated from his employment because he engaged in improper sexual harassment. The Circuit Court for Howard County reversed and ordered that the employee be reinstated with back pay. This appeal involves the issue of whether the circuit court was correct in finding that the SOPD's order was "unsupported by substantial evidence" because it did not "adequately state her reasons for disagreeing with the ... decision" of an Administrative Law Judge (ALJ).

(i)

On December 10, 1991, the employee, appellee Carl M. Shrieves, was suspended pending the filing of charges for removal from his security attendant position at the Clifton T. Perkins Hospital Center (Perkins), a facility of appellant, the Department of Health and Mental Hygiene (DHMH). Mr. Shrieves was charged with violations of certain personnel department rules and Standard Procedure D–31 (Sexual Harassment Policy) arising from an incident on November 13, 1991. Mr. Shrieves appealed to the Office of Administrative Hearings (OAH) and a hearing was held before an ALJ in February and March 1992. Twenty-four witnesses testified before the ALJ and numerous exhibits were presented; the transcript of the hearing consumes 1158 pages. The proposed decision of the ALJ is twenty-nine pages and includes eighty-five separately numbered factual findings. The ALJ's num-

bered factual findings are excerpted and summarized below; quotation marks indicate the ALJ's words, not those of the witnesses.

At the time of the ALJ hearing, Mr. Shrieves had been employed at Perkins for seventeen years. Among his job responsibilities were training officer, Agency Technical Representative (training employees on the State drug testing policy) and photographer for employee identification cards. On November 13, he took the photograph of Kristen M. Shavatt, a twenty-two year old telephone operator, who had been employed at Perkins for two years at the time of the ALJ hearing. The photograph was taken in the "photo identification room." That room, which is audio-monitored, is located in Perkins' maximum security section and so must be kept locked at all times; Ms. Shavatt did not have a key to the room, but Mr. Shrieves did. Because Ms. Shavatt did not like her first photograph, she requested it be retaken and so was the last person in the locked photo identification room with Mr. Shrieves. Ms. Shavatt testified at the hearing that during the photography session Mr. Shrieves made "unwanted sexual advances." He told her "he wanted to take her out and make love to her." When she tried to leave the locked photo identification room, she stated that Mr. Shrieves "would not let her out unless she kissed him." Finally, when "she raised her voice and told Mr. Shrieves to let her out, he did so."

In a written statement, made for the police the day following the incident, November 14, 1991, Ms. Shavatt similarly stated that Mr. Shrieves told her during the photography session that he wanted "to spend time with her alone." She walked away "over to the door" and said "come on let's go." Mr. Shrieves then "went over to her and said he would not let her go unless she kissed him. Ms. Shavatt stated that she quickly pushed him away and yelled that he had better let her out and to open the door." In a criminal complaint filed by

Ms. Shavatt shortly after the incident,[1] she related a very similar story. In it "Ms. Shavatt stated that Mr. Shrieves told her he was hoping that they would spend some time together alone and that he wanted to make love to her. After trying to get Mr. Shrieves to hurry and finish the photos, Ms. Shavatt stated that he then snapped her picture. He pulled out the picture and stated that he wanted to take her out for a couple drinks after work. Ms. Shavatt stated that she walked over to the door and turned the knob to let Mr. Shrieves know she was ready to leave. According to Ms. Shavatt, Mr. Shrieves finally walked over to the door and told her she would have to kiss him if she wanted to get out. Ms. Shavatt stated that Mr. Shrieves got very close, then she pushed him away, and yelled to let her out."

"In his testimony, Mr. Shrieves denied Ms. Shavatt's account of the incident. He stated that after taking her picture, she was dissatisfied with it and asked him several times to retake it. In order to get her to smile, Mr. Shrieves joked with her about puckering her lips for a kiss. He denied telling Ms. Shavatt that she would have to kiss him if she wanted to be let out of the room. Mr. Shrieves testified that before he finishes his work, equipment is cleaned up. While he was cleaning up, Ms. Shavatt became impatient and asked to leave. He stated that he did not open the door immediately because of the need to clean up and because he could not let her leave the room unescorted since it was a maximum security area. When Ms. Shavatt elevated her voice and said let me out of here, Mr. Shrieves stated that he told her to stop being silly and that people would hear her." In a written statement dated November 20, 1991, Mr. Shrieves "denied touching Ms. Shavatt or engaging in any improper or unprofessional conduct."

State Trooper P.A. Jameson, who testified at the hearing, interviewed both Ms. Shavatt and Mr. Shrieves shortly after the incident. "According to Trooper Jameson, Ms. Shavatt

---

1. As the ALJ (and later the SOPD) noted, the criminal complaint was ultimately "nolle prossed because of a faulty charging document."

stated that she had one picture taken and left the room to get another form. When she returned, she was the last person in the room. Ms. Shavatt did not like her first picture and asked for another. When she was finished and ready to leave, Ms. Shavatt stated that Mr. Shrieves came toward her and stated that he wanted to spend time with her alone. Ms. Shavatt walked away and stood by the door, but could not leave because it was locked. Mr. Shrieves then approached her again and stated that she could not leave until she gave him a kiss. Ms. Shavatt stated that she pushed Mr. Shrieves away and screamed that she wanted to be let out of the room. According to the report, Ms. Shavatt then stated that Mr. Shrieves opened the door."

"Trooper Jameson's account of his interview with Mr. Shrieves was recorded in a question and answer format. Mr. Shrieves was asked 15 specific questions about various aspects of the incident and his relationship with Ms. Shavatt. His report states in pertinent part:

Question # 4: Did you make any statements that you would consider inappropriate to Kristen while both of you were in the photo lab?

Answer # 4: Mr. Shrieves stated that he jokes around a lot and may have said something suggestive. "I may have said I love you", however, I say this to many people just being playful. Kristen had finished her picture and wanted another re-taken that is why she was the last to leave. She couldn't leave because I had the key and was cleaning up.

Question # 6: Did you make the statement that Kristen could not leave unless she gave you a kiss?

Answer # 5: [sic] Mr. Shrieves stated that I may have said "If you don't confess that you love me I won't let you leave." I made this comment to make Kristen laugh while I was taking her picture.

Question # 11: Did you approach Kristen in a threatening manner?

Answer # 11: Mr. Shrieves stated, "I did approach her and she only pushed me away after she disliked the picture I had taken. If you are asking whether any contact was made, at some point, yes, but it happens with a lot of employees."

Question # 13: Did you ever ask for a kiss from Kristen while in the photo room?

Answer # 13: Mr. Shrieves stated, "I may have asked her for a kiss, I get along with a lot of people, I don't keep count of what I say. I wouldn't say anything different to anyone."

"With respect to the police report, Mr. Shrieves admitted that part of the report was accurate, but contended that some of the statements attributed to him were taken out of context. Further, while Mr. Shrieves admitted to asking Ms. Shavatt for a kiss, he stated that he told the officer he did so jokingly. Mention is made of this claim in the police report."

In addition to the evidence as to the November 13 incident, there was also conflicting testimony by Ms. Shavatt and Mr. Shrieves as to their prior communications. For example, "[a]ccording to Ms. Shavatt, when Mr. Shrieves saw her, he would put his arm around her and make 'crazy' conversation. Further, Ms. Shavatt stated that Mr. Shrieves would ask her out after work for drinks a couple of times a week. . . . Ms. Shavatt stated that Mr. Shrieves told her that he would get an apartment so that they could live together." On the other hand, "Mr. Shrieves denied asking Ms. Shavatt for a date, or to live with him. He stated that he would not ask her for a date due to the age differences between them and that he did not view their friendship in that manner. Further, Mr. Shrieves stated that he is married and would not have asked her to live with him. Mr. Shrieves further testified that he does not drink."

When Ms. Shavatt returned to her work station on November 13, she encountered her supervisor, Gwendolyn Joyner. Ms. Joyner testified that Ms. Shavatt did not seem upset and did not mention any sexual harassment, only that her identifi-

cation picture was ugly. Another employee who had been in the room with Ms. Shavatt and Mr. Shrieves prior to the incident, Ursula Carter, testified that Mr. Shrieves had joked with both of them in order to make them smile. Moreover, there was testimony from a number of other Perkins employees that Mr. Shrieves often joked in this manner and that no one took any offense; in addition, a number of witnesses testified to Mr. Shrieves's good character. There was, however, testimony from some other witnesses that Mr. Shrieves had made inappropriate remarks to them and other employees.

"After reviewing the police report, the [Perkins] Committee [established to review this matter] decided, based on the report, that Mr. Shrieves had committed the alleged offense of sexual harassment." One member of the Committee "testified that prior to the receipt of the report, a case had not been established against Mr. Shrieves because it was Ms. Shavatt's word against his. After review of the report, [that member] testified that she concluded that Mr. Shrieves was guilty of the alleged offense because he had made an admission of guilt. [Dr.] Sasscer–Burgos [the Chair of the Committee] similarly testified that she concluded, based on the report, that Mr. Shrieves had admitted to guilt. On the other hand, [still another member] testified that the report did not provide a basis for finding that Mr. Shrieves had committed sexual harassment of Ms. Shavatt."

"Dr. Sasscer–Burgos testified that the committee recommended that Mr. Shrieves be suspended pending termination because it believed the incident to be of such a serious nature as to warrant dismissal. In reaching this decision, Dr. Sasscer–Burgos testified that the committee took into account the facts that the incident involved a young girl, that Mr. Shrieves was a training officer who was familiar with the sexual harassment policy, that Mr. Shrieves was an older, long-term employee and that he had the keys to the room while the employee did not. Further, Dr. Sasscer–Burgos testified that the committee considered the fact that Mr. Shrieves was in a

security position and could potentially affect anyone's job because of the drug testing."

"Dr. Sasscer–Burgos further stated that the incident, itself, was sufficient to warrant dismissal, but that other evidence was also considered. Specifically, the committee considered a complaint of sexual harassment filed by another employee, a Ms. Helbig. Although this complaint was settled prior to adjudication, Ms. Sasscer–Burgos testified that she believed that Mr. Shrieves had committed the alleged acts of sexual harassment. Dr. Sasscer–Burgos also testified that the committee considered other instances of sexual harassment engaged in by Mr. Shrieves. Dr. Sasscer–Burgos described to the committee her own experiences. She stated that Mr. Shrieves had a habit of standing too close to her. Dr. Sasscer–Burgos further testified that students mentioned to her that Mr. Shrieves joked with them in ways that made them uncomfortable. Dr. Sasscer–Burgos could not recall the jokes, but conceded that they were not of a sexual nature. She also stated that Mr. Shrieves had a reputation of being overly familiar with female employees."

The Acting Superintendent of Perkins, Dr. Christiane Tellefsen, was responsible for making the final decision regarding disciplinary action against Mr. Shrieves. In making her decision, Dr. Tellefsen "considered the nature of the incident, the position of authority of Mr. Shrieves, his history of prior behavior, including the Helbig case, and [his] training position." Dr. Tellefsen testified "that she assumed the Helbig case was settled because the Hospital was unable to defend the charge.... Dr. Tellefsen also based her decision on the police report" in which she believed Mr. Shrieves "said he may have done the things of which he was accused."

After recounting these facts, the ALJ discussed her conclusions. She noted that although "Management" had filed charges for removal based on Mr. Shrieves's unsatisfactory attendance record and his asserted sexual harassment of a female co-worker, the "main, if not sole" reason for his discharge was the sexual harassment charge; no party disputes

that conclusion. The ALJ then examined the COMAR regulations and Sexual Harassment Policy that Mr. Shrieves was charged with violating. The ALJ appears, *sub silentio*, to have concluded that a violation of the COMAR regulations could only have been found if the policy had been violated; again, no party challenges this conclusion. The sexual harassment policy provides in pertinent part:

> Every employee shall refrain from such conduct as sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature which may constitute sexual harassment.

> Sexual harassment is defined to include, but is not limited to:

> (1) Unwelcomed sexual advances, requests for sexual favors, and other verbal and physical conduct of a sexual nature.

> (2) Discrimination is based on sex that results in economic or privilege loss to the employee.

> (3) Infringement of any employee's right to work in an environment free from unwanted sexual attention and sexual pressure of any kind that creates a hostile or offensive working environment.

> (4) Unwelcomed sexual remarks or unwelcomed sexual actions against a fellow employee or applicant for employment while on the work site or during working hours. These prohibited unwelcomed remarks or actions may be, but are not limited to, the following:

>> 1. Lewd remarks, catcalls, whistles, or obscene reference to an employee's anatomy.

>> 2. Unwanted physical advances or contact by one employee to another.

>> 3. Requests for acquiescence in sexual acts by one employee to another.

>> 4. Repeated propositions for dates by one employee to another.

The ALJ concluded that Perkins "failed to show, by a preponderance of the evidence, that Mr. Shrieves committed the offense of sexual harassment in violation of" this policy, and that Mr. Shrieves's conduct, although perhaps inappropriate, did not constitute sexual harassment. Noting that there were no eyewitnesses to the incident, the ALJ found "Mr. Shrieves'[s] account of the incident credible." According to the ALJ, Mr. Shrieves's credibility was bolstered by several factors. The ALJ noted that Mr. Shrieves had a reputation for joking "and has made the same kinds of comments . . . to other employees" and so, although his "behavior may seem unusual, it would not have been out of character."

The ALJ found Mr. Shrieves's credibility "further demonstrated" by testimony of Ms. Carter, whom the ALJ found "to be credible," that Mr. Shrieves had been joking with her and Ms. Shavatt in the photo-identification room prior to the incident. This testimony, the ALJ stated, was "not only consistent with Mr. Shrieves['s] account, but . . . at odds with the claimed acts of harassment." The ALJ concluded that Ms. Joyner's testimony that Ms. Shavatt "made no complaints . . . and showed no signs of discomfort or stress" after the incident added further "credence to Mr. Shrieves'[s] account." The ALJ noted that the room where the incident took place was "audio-monitored and that Mr. Shrieves knew that this was the case"; she believed it "unlikely that he would have engaged in the claimed conduct knowing" this. The ALJ concluded that Ms. Shavatt's other charges, e.g., that Mr. Shrieves asked her out for drinks and to live with him, were contradicted by Mr. Shrieves's "unrebutted testimony" to the contrary, and this was "further supportive of Mr. Shrieves' account." In addition, the ALJ "was impressed with testimony of [Mr. Shrieves's] numerous character witnesses."

The ALJ rejected Perkins's contention that Mr. Shrieves' "made an admission of guilt in the police report prepared by Officer Jameson." She was "troubled by Management's reliance on this report since it was based on unrecorded interviews and did not contain verbatim transcripts of the interviews." She concluded, in any event, that "review of the

report discloses no admission of guilt on the part of Mr. Shrieves." Thus, the ALJ found "no basis for concluding that Mr. Shrieves committed the alleged offense on the basis of an admission of guilt."

Finally, the ALJ determined that Perkins's introduction of evidence of Mr. Shrieves's improper conduct and comments toward other employees was unpersuasive. She concluded that the evidence failed to demonstrate "unwelcome sexual advances" as opposed to mere "joking." With regard to the Helbig complaint, she noted that it had "some relevance," but that its filing did not "prove Mr. Shrieves committed the offense charged," and that he was never "disciplined" as a result of the Helbig complaint.

The DHMH filed exceptions to the ALJ's proposed decision with the SOPD. After hearing oral argument, and considering the record,[2] the SOPD issued her own thirty page order. The SOPD rephrased, reordered, and renumbered the ALJ's factual findings, which we have summarized above, however, the SOPD adopted the substance of each of the ALJ's numbered findings in the SOPD's own findings.

The SOPD also made several additional factual findings. She found, "Ms. Shavatt was reluctant to report th[e] incident at the agency because of Mr. Shrieves'[s] position with the Security Department and his friendship with Ms. Joyner." The SOPD found the following additional portions of Trooper Jameson's report were also "pertinent":

Question # 6: At any time did you approach Kristen in the photo lab in a manner in which she would find threatening and at any time did she scream?

Answer # 6: I may have walked toward her at some time.

---

**2.** The circuit court expressed doubt that the SOPD could have reviewed the testimony at the hearing before the ALJ, because it was not transcribed until after the SOPD made her findings. The SOPD, however, not only noted three times that her decision was based on a review of the record, but also expressly stated that she had "carefully evaluated ... the extensive record in this case." The SOPD's detailed order is entirely consistent with such a review.

Question # 7: Did she start to scream?

Answer # 7: Mr. Shrieves stated that Kristen started yelling let me out of this door. She yelled that. I think she was pretending that she was being held hostage. I told her to be quiet there are people all around us. I did not want anyone to think something was going on. Some people were walking by the door but I don't know who. I don't think Kristen had ever been in a maximum security section before. I think she got scared.

Question # 8: Did there ever come a time when you walked toward Kristen and she pushed you away?

Answer # 8: She only pushed me in a playing manner because she didn't like the picture I took.

Question # 9: Did she ever push you away from her?

Answer # 9: Mr. Shrieves stated that even if she did I wouldn't find it significant. At times she has thrown things at me in a playful manner. Mr. Shrieves then stated that he believes Kristen is dating Aaron Barnett another security attendant.

Question # 15: What exactly again did Kristen scream while she was at the door?

Answer # 15: I think it was a playful holler there was no physical contact. "I play around a lot, I go to the radio room, I sit on the other operator's lap and always hug her. Kristen can tell you that. I wouldn't put my hands on a twenty year old girl."

Finally, the SOPD found, "Trooper Jameson testified that Mr. Shrieves'[s] exact words are enclosed in quotation marks in his report." The SOPD "conclude[d] that the agency had met its required burden of establishing that Mr. Shrieves violated COMAR .47D, E and M, as well as the agency's policy on sexual harassment."

(ii)

Mr. Shrieves appealed to the Circuit Court for Howard County, which reversed the order of the SOPD. The circuit court recognized that the "substantial evidence" test was

applicable in this administrative appeal. *See, e.g., Bulluck v. Pelham Wood Apartments*, 283 Md. 505, 512, 390 A.2d 1119 (1978). Relying on *Anderson v. Department of Pub. Safety & Correctional Servs.*, 330 Md. 187, 623 A.2d 198 (1993), the circuit court found, however, that its "job" was "to determine if the ALJ had a rational basis for making the decision she did," *i.e.*, if there was substantial evidence to support the ALJ's decision. The lower court concluded that "the decision of the ALJ was based on substantial evidence." The court explained that the ALJ was in the best position to judge the credibility of the witnesses, which was "the cornerstone of the case," and that *Anderson* permitted the SOPD "to reject credibility assessments only if [she] gives strong reasons for doing so." *See Anderson*, 330 Md. at 217, 623 A.2d 198 (quoting Charles H. Koch, *Administrative Law and Practice*, § 6.73 at 522 (1985)). Because the circuit court concluded that the SOPD "did not adequately state her reasons for disagreeing with the ALJ's decision," it found that the SOPD's decision was "unsupported by substantial evidence." For this reason, the circuit court ordered that Mr. Shrieves "be reinstated to his position as a Security Attendant" and awarded "back pay and any lost benefits."

The circuit court is to be commended on its careful consideration of and obvious attempt to follow *Anderson*. Unfortunately, however, the lower court misunderstood the foundation of the *Anderson* opinion. Although *Anderson* focused on the relationship between the ALJ's recommendation and the final agency order, *Anderson* did not set forth a new standard for judicial review of administrative decisions involving ALJ recommendations, as the circuit court apparently believed. Thus, *Anderson* does not direct that when an agency rejects an ALJ's recommendation—even one based on credibility determinations—a reviewing court is to reverse the agency if the *ALJ's* recommendation "was based on substantial evidence."

Rather, in *Anderson* the Court of Appeals carefully reiterated the longstanding substantial evidence standard: it is the *final* order of the administrative agency that is subjected to deferential judicial review. *Anderson*, 330 Md. at 215, 623

A.2d 198. Only if that order is not based on substantial evidence can it be reversed by a court. *Id.* Thus, the *Anderson* court expressly held that the creation of the Office of Administrative Hearings, with its core of ALJs, did not change the well established common law "standard for judicial review." *Id.* at 214, 623 A.2d 198. Relying on Justice Frankfurter's famous explication of this issue in *Universal Camera Corp. v. National Labor Relations Bd.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), the Court of Appeals noted the " 'substantial evidence' standard is not modified in any way when the [agency] and its examiner disagree." *Anderson*, 330 Md. at 215–16, 623 A.2d 198 (quoting *Universal Camera*, 340 U.S. at 496, 71 S.Ct. at 468–69) (alteration in original).

■ The court below erred in viewing its "job" as "determin[ing] if the ALJ had a rational basis for making the decision she did" or if the ALJ's decision was supported by substantial evidence. The court's "job" was not to assess the "rationality" of or evidentiary basis for the ALJ's recommendation; it was to assess the rationality or evidentiary basis of the agency's—here the SOPD's—final order. *See Parker for Lamon v. Sullivan*, 891 F.2d 185, 189 (7th Cir.1989) (a court "does not review the decision of the ALJ but rather the decision of the" agency); *Drexel Burnham Lambert, Inc. v. Commodity Futures Trading Comm'n*, 850 F.2d 742, 747 (D.C.Cir.1988) (when the agency and an "ALJ disagree on factual inferences to be drawn from the record ... the question to be decided is *not* whether the agency has 'erred' in 'overruling' the ALJ's findings, but whether its *own* findings are reasonably supported on the entire record") (emphasis in original).

It is, of course, true that the central teaching of *Anderson* and *Universal Camera* is that when making this assessment a court should recognize

that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the [agency's] than when he has

reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony.

*Anderson,* 330 Md. at 216, 623 A.2d 198 (quoting *Universal Camera,* 340 U.S. at 496, 71 S.Ct. at 468–69) (alteration in original). When "assessing the credibility of the witnesses ... the agency should give appropriate deference to the opportunity of the examiner to observe the demeanor of the witnesses," and the agency should reject credibility assessments only if it gives "strong reasons." *Id.* at 216–17, 623 A.2d 198. *See, e.g., Chirino v. National Transp. Safety Bd.,* 849 F.2d 1525, 1530 (D.C.Cir.1988) (agency's determination that witness was "inherently incredible" when "adequately buttressed by the record" was a "compelling reason" to overturn ALJ's credibility determination). Nevertheless, because the "responsibility for the final decision [is] placed on the agency," not the ALJ, it is "wholly inconsistent with this notion that the [agency] has power to reverse an examiner's findings only when they are clearly erroneous." *Anderson,* 330 Md. at 215, 623 A.2d 198 (quoting *Universal Camera,* 340 U.S. at 492, 71 S.Ct. at 466–67). Indeed, only a few years after *Universal Camera,* the Supreme Court held that a lower court erred in concluding that an examiner's findings "based on demeanor of a witness are not to be overruled" by an agency "without a 'very substantial preponderance in the testimony as recorded.'" *See Federal Communications Comm'n v. Allentown Broadcasting Corp.,* 349 U.S. 358, 364, 75 S.Ct. 855, 859, 99 L.Ed. 1147 (1955).

What deference then is an agency to give to the various findings of the ALJ? *Anderson* and *Universal Camera* teach that all of the ALJ's findings "are to be considered" by the agency. *Anderson,* 330 Md. at 216, 623 A.2d 198 (quoting *Universal Camera,* 340 U.S. at 496, 71 S.Ct. at 468–69). Generally, the ALJ's findings, however, "are not entitled to any special deference from the agency except insofar as [they] are based on witness credibility determinations." *Mattes v. United States,* 721 F.2d 1125, 1129 (7th Cir.1983). The significance to be given to ALJ's credibility determina-

tions "depends largely on the importance of credibility in the particular case." *Anderson,* 330 Md. at 216, 623 A.2d 198 (quoting *Universal Camera,* 340 U.S. at 496, 71 S.Ct. at 468–69). If credibility is not important in the agency's final decision, an ALJ's credibility determinations are not very significant. *See Mattes,* 721 F.2d at 1129–30; *Parker for Lamon,* 891 F.2d at 189. If credibility is of "utmost importance," if it "played a dominant role," if it was "pivotal" to an agency's final order—as in *Anderson,* 330 Md. at 218, 623 A.2d 198—then an ALJ's credibility determinations are entitled to substantial deference.

Resolution of what a "credibility" determination is in this context is thus critical—and somewhat problematic. As one court has pointed out,

> Arguably, credibility is at issue in virtually every case, or at least in any case involving testimonial evidence. When an ALJ decides, from the whole of the record, that one side has made the more persuasive argument, he is concluding that that party is more "credible." ... "Credibility" has a much narrower meaning, however, if it is interpreted as synonymous to witness demeanor.

*Kopack v. National Labor Relations Bd.,* 668 F.2d 946, 953 (7th Cir.), *cert. denied,* 456 U.S. 994, 102 S.Ct. 2278, 73 L.Ed.2d 1290 (1982). The prevailing view in the federal courts is that only the latter, *i.e.,* demeanor-based determinations, are the sort of credibility determinations entitled to special deference.

The first modern case to explain the rationale for this conclusion is *Penasquitos Village, Inc. v. National Labor Relations Bd.,* 565 F.2d 1074 (9th Cir.1977). There the Court distinguished between: (1) testimonial inferences, "credibility determinations based on demeanor," and (2) derivative inferences, "inferences drawn from the evidence itself." *Id.* at 1078. It concluded that a reviewing court must defer to an ALJ's testimonial inferences, but to the *agency's* derivative inferences, explaining:

Weight is given the administrative law judge's determinations of credibility for the obvious reason that he or she "sees the witnesses and hears them testify, while the Board and the reviewing court look only at cold records." All aspects of the witness's demeanor—including the expression of his countenance, how he sits or stands, whether he is inordinately nervous, his coloration during critical examination, the modulation or pace of his speech and other nonverbal communication—may convince the observing trial judge that the witness is testifying truthfully or falsely. These same very important factors, however, are entirely unavailable to a reader of the transcript, such as [an agency or reviewing court]. But it should be noted that the administrative law judge's opportunity to observe the witnesses' demeanor does not, by itself, require deference with regard to his or her derivative inferences. Observation makes weighty only the observer's testimonial inferences.

Deference is accorded [an agency's] factual conclusions for a different reason-[the agency is] presumed to have broad experience and expertise in [the area].... Further, it is the [agency] to which [the legislature] has delegated administration of the [statute]. The [agency], therefore, is viewed as particularly capable of drawing inferences from the facts.... Accordingly, ... a [reviewing court] must abide by the [agency's] derivative inferences, if drawn from not discredited testimony, unless those inferences are "irrational," ... "tenuous" or "unwarranted." ... As already noted, however, the [agency], as a reviewing body, has little or no basis for disputing an administrative law judge's testimonial inferences.

*Id.* at 1078–79 (internal citations omitted).

Although *Anderson* did not explicitly adopt the view that only an ALJ's demeanor-based credibility determinations are entitled to special deference, it does appear to have implicitly adopted this position. *Anderson* directs that in assessing the credibility of witnesses "the agency should give appropriate deference to the opportunity of the examiner to observe the *demeanor* of the witnesses." *Anderson,* 330 Md. at 216, 623

A.2d 198 (emphasis added). Moreover, the *Anderson* court quotes a portion of the above language from *Penasquitos,* describing demeanor, in explaining the importance of the ALJ's credibility determinations. *Id.*

Furthermore, this distinction between demeanor-based findings and others, which was first made in *Universal Camera* on remand, *National Labor Relations Bd. v. Universal Camera Corp.,* 190 F.2d 429, 432 (2d Cir.1951) (Frank, J. concurring), has been expressly or implicitly adopted in a number of recent federal opinions. *See, e.g., National Labor Relations Bd. v. Augusta Bakery Corp.,* 957 F.2d 1467, 1475 (7th Cir.1992); *Drexel Burnham Lambert,* 850 F.2d at 747 & n. 7; *Stamper v. Secretary of Agric.,* 722 F.2d 1483, 1486 (9th Cir.1984); *Mattes,* 721 F.2d at 1129 & n. 5; *Kopack,* 668 F.2d at 953; *Eastern Eng'g & Elevator Co. v. National Labor Relations Bd.,* 637 F.2d 191, 197–98 (3rd Cir.1980). It seems to us that it is well taken and the only interpretation consistent with *Universal Camera* itself. As the Court of Appeals for the Ninth Circuit explained:

> If one were to interpret "credibility" broadly, to include what Judge Wallace [in *Penasquitos* ] termed "derivative inferences," credibility would be critical to virtually every decision reached by an ALJ. Such a result is not consistent with *Universal Camera.* Prior to its reference to credibility, the *Universal Camera* Court directed a reviewing court to consider the "findings" of the examiner in determining whether the Board decision is supported by substantial evidence. Embodied in those findings are the ALJ's derivative inferences. If credibility is more significant in some cases than in others, as *Universal Camera* implies, the term must have a more limited meaning.

*Kopack,* 668 F.2d at 953.

Here the circuit court correctly recognized that an SOPD had to give "strong reasons" for rejecting an ALJ's credibility determinations if such credibility determinations are important to the SOPD's decision; it erred, however, in believing that this was the *focus* of judicial review. When reviewing an

agency's decision overruling an ALJ's recommendation, the question is not "whether the agency erred" in overruling the ALJ but whether there is substantial evidence for the agency's decision. *Id.* at 952. Accordingly, the "power of administrative law judges to render initial decisions does not mean that [an agency] is 'relegated to the role of [a] reviewing court,'" *Faulkner Radio, Inc. v. Federal Communications Comm'n,* 557 F.2d 866, 870 n. 23 (D.C.Cir.1977) (first alteration added).

The lower court also erred in unduly limiting the SOPD in its review of the ALJ's recommendation, *i.e.,* in faulting the SOPD for "substitut[ing] her judgment for that of the ALJ." It is the agency's responsibility to make the final decision; in doing so, it certainly may "substitute" its judgment for that of the ALJ. *See Mattes,* 721 F.2d at 1129 ("[T]he agency is free to substitute its judgment for that of the ALJ."). Moreover, the agency's substituted judgment must be affirmed by a court—*if* it is based on substantial evidence. The ALJ's recommendation—and particularly its credibility findings—are part of that evidence, but if there is "evidence to support each of two conflicting views," *e.g.,* the ALJ's *and* the agency's, the findings of the agency "must be allowed to stand despite the fact that [a court] might have reached the opposite conclusion on [its] own." *Kopack,* 668 F.2d at 952; *see also Faulkner,* 557 F.2d at 870 n. 23.

To summarize, when an administrative agency overrules the recommendation of an ALJ, a reviewing court's task is to determine if the agency's final order is based on substantial evidence in the record. In making this judgment, the ALJ's findings are, of course, part of the record and are to be considered along with the other portions of the record. Moreover, where credibility is pivotal to the agency's final order, ALJ's findings based on the demeanor of witnesses are entitled to substantial deference and can be rejected by the agency only if it gives strong reasons for doing so. If, however, after giving appropriate deference to the ALJ's demeanor-based findings there is sufficient evidence in the record to support both the decision of the ALJ and that of the

agency, the agency's final order is to be affirmed—even if a court might have reached the opposite conclusion. This approach preserves the rightful roles of the ALJ, the agency, and the reviewing court: it gives special deference to both the ALJ's demeanor-based credibility determinations and to the agency's authority in making other factual findings and properly limits the role of the reviewing court. The circuit court's failure to follow this approach was error.

Having identified legal error in the circuit court's decision, the question becomes what is the appropriate remedy. In very similar circumstances, the Supreme Court has remanded to the lower court, explaining:

> The correction of errors of law by a Court of Appeals on review of administrative agencies is committed to this Court through its certiorari jurisdiction. We have found such errors of law in the decision of the Court of Appeals. Therefore, the decision below cannot stand. But it is not our function to reinstate the determination of the Commission. That would make this Court the reviewing body of the ultimate determination of the Commission. The proper disposition is to remand the case to the Court of Appeals for reconsideration of the record but freed from rulings declared erroneous in this opinion.

*Allentown Broadcasting, supra,* 349 U.S. at 365, 75 S.Ct. at 859–60.

■ The Court of Appeals of Maryland does not appear to have ever followed such a course. Rather, after finding a lower court erred in reviewing an administrative decision, the Court of Appeals repeatedly has proceeded directly to the review of the administrative decision itself. *See, e.g., Maryland State Police v. Lindsey,* 318 Md. 325, 334–36, 568 A.2d 29 (1990) (remanding for reinstatement of agency decision); *Motor Vehicle Admin. v. Lindsay,* 309 Md. 557, 563–64, 525 A.2d 1051 (1987) (remanding to circuit court and directing it to affirm agency's decision). Moreover, it is well recognized in Maryland that, when reviewing administrative decisions, the role of an appellate court is precisely the same as that of the

circuit court. *See, e.g., Baltimore Lutheran High Sch. Ass'n, Inc. v. Employment Security Admin.*, 302 Md. 649, 662, 490 A.2d 701 (1985) ("a reviewing court, be it a circuit court or an appellate court, shall apply the substantial evidence test"). For these reasons, rather than remanding to the circuit court for it to determine, under the correct legal standards, whether the SOPD's decision is based on substantial evidence, we shall address the question.

(iii)

■ In order to decide whether an administrative decision is supported by substantial evidence, a court must examine: (1) the facts found by the agency, (2) the evidentiary support in the record for those findings, and (3) the rationale for the conclusions drawn from those findings by the agency. *See Forman v. Motor Vehicle Admin.*, 332 Md. 201, 221, 630 A.2d 753 (1993) ("Without findings of fact on all material issues, and without a clear statement of the rationale behind the [administrative] decision, a reviewing court cannot perform its function."). There was certainly extensive fact-finding here. Both the ALJ and SOPD engaged in comprehensive and careful factfinding. We have summarized and extracted many—but not all—of these findings. Moreover, there is no lack of evidentiary support in the administrative record for these findings. Our examination of the record indicates that every one of the numbered findings of fact made by the ALJ and every one of the numbered findings of fact made by the SOPD is supported by evidence. Indeed, the ALJ's extensive numbered factual findings provide adequate support not only for the ALJ's decision but also for the SOPD's contrary decision; similarly, the SOPD's equally extensive numbered findings provide adequate support not only for her decision but also for the ALJ's contrary recommendation.

This is the genesis of the difficulty with judicial review of the agency decision here. A fact finder could conclude on this record, as the ALJ did, that Mr. Shrieves did not sexually harass Ms. Shavatt; however, a factfinder could also conclude, as the SOPD did, that Mr. Shrieves did sexually harass Ms.

Shavatt. Accordingly, the rationale or basis for the ultimate administrative decision is crucial here. Unfortunately, that rationale is far from clear. The numbered fact findings for the most part recount the witnesses' testimony; they make no attempt to resolve the witnesses' differing views of the same event.

The ALJ resolved this conflict in the "discussion" section of her opinion in which she stated the basis or rationale for her recommendations. There is no doubt as to the grounds for her rationale or as to the fact that credibility was arguably "pivotal" to the ALJ's recommendation. After noting that "the only direct evidence of what took place consists of testimony provided by Mr. Shrieves and Ms. Shavatt," the ALJ concluded that "Mr. Shrieves'[s] account of the incident [was] credible." That conclusion seems to be based on Mr. Shrieves's demeanor. (Conceivably, it is just a summary sentence introducing the record evidence supporting this conclusion). The ALJ also concluded that Mr. Shrieves's credibility was "further demonstrated" by several factors, some of which were also arguably demeanor-based, *e.g.*, Ms. Carter and Ms. Joyner were credible and Mr. Shrieves's character witnesses were impressive.[3] If the SOPD was going to reject demeanor-based determinations and base her opinion on other demeanor-based credibility determinations, she would have to have provided "strong reasons" for doing so.

This is precisely what the SOPD attempted, but failed, to do in *Anderson*. There, a correctional officer was charged with using excessive force in subduing an inmate. *Anderson*, 330 Md. at 190, 623 A.2d 198. Eleven witnesses testified before the ALJ, including Anderson and the two other officers who

---

**3.** Of course, many of the factors assertedly bolstering Mr. Shrieves's credibility were clearly derivative inferences—based on evidence other than demeanor—and so could be rejected without "strong reasons," *e.g.*, the finding that Mr. Shrieves's reputation for joking and making similar comments were indicative of the innocence of his remarks to Ms. Shavatt, and the finding that the photo identification room was, as Mr. Shrieves knew, audio-monitored and so it was unlikely that the events took place as Ms. Shavatt suggested.

were present during the attack. *Id.* at 199, 207, 623 A.2d 198. At the conclusion of the hearing, the ALJ made 31 findings of fact, concluded that Anderson had not used excessive force, and ordered the reversal of Anderson's suspension and his reinstatement with back pay. *Id.* at 199–204, 623 A.2d 198. On appeal, the SOPD's findings of fact deviated, without explanation, in several ways from those of the ALJ. The SOPD reasoned that the ALJ "apparently gave weight to only the testimony of Sergeant Anderson and [the two other officers].... It appears that he completed [sic] ignored, without explanation, the testimony of other witnesses." *Id.* at 207, 623 A.2d 198; *see also* Record Extract at 17–18, *Anderson v. Department of Pub. Safety & Correctional Servs.*, 330 Md. 187, 623 A.2d 198 (1993). Although the SOPD acknowledged that the officers all testified that Anderson acted to protect himself and one of the other officers, the SOPD concluded that,

[i]t *was clear from Mr. Anderson's testimony* that he considered the crutch a weapon and he believed that the inmate should not be allowed to retain it in his cell. However, the uncontroverted testimony that the inmate needed the crutch to navigate and that his hands were cuffed in front of him throughout the entire incident cannot be ignored. Also *several of the witnesses confirmed management's contention* that Mr. Anderson could have retreated from the cell and locked the inmate inside, instead of taking such an aggressive stance of trying to single-handedly wrest the crutch from the inmate.

*Anderson*, 330 Md. at 208, 623 A.2d 198 (emphasis added); Record Extract at 19. Therefore, the SOPD concluded that Anderson's "own testimony concerning his involvement in the physical altercation ... leads one to reasonably conclude that he used more force than necessary to resolve the situation." *Anderson*, 330 Md. at 208–09, 623 A.2d 198 (alteration in original); Record Extract at 19–20.

The SOPD in *Anderson* thus rejected the ALJ's credibility determinations and made her own credibility determinations without any reason, let alone a strong one. It was because of

this that the Court of Appeals held that the circuit court erred in finding substantial evidence to support the SOPD's order and so remanded the case to the Secretary of Personnel for further proceedings.

While demeanor-based credibility determinations may well have been crucial to the ALJ's decision in the case before us, as they were to the ALJ's decision in *Anderson*, it is not at all clear that rejection of the ALJ's demeanor-based credibility determinations were crucial to the SOPD's decision here. The SOPD here, unlike the SOPD in *Anderson*, did not make any findings of fact contrary to, or inconsistent with, those of the ALJ. Indeed, the SOPD here did not even reject the substance of any of the ALJ's factual findings. On the other hand, the SOPD's ultimate decision here is certainly contrary to the recommendation of the ALJ, a recommendation that seems to be grounded, at least to some extent, on demeanor-based credibility determinations.

In explaining her decision, the SOPD stated that she "conclude[d] that the charges against Mr. Shrieves should be sustained" and that "[t]he following reasons support this conclusion:"

1) It is clear from the testimony presented by Trooper Jameson, Mr. King and Mr. Shrieves himself that Mr. Shrieves never denied Ms. Shavatt's accusations. Instead, Mr. Shrieves attempted to rationalize his actions. When asked directly during the administrative hearing whether he made specific remarks that were recorded in Trooper Jameson's report, Mr. Shrieves consistently contended that such remarks were taken out of context by Trooper Jameson and misinterpreted by Ms. Shavatt. In his direct testimony, Mr. Shrieves explained that during the picture-taking session with Ms. Shavatt, he made several comments in an attempt to make her smile. For example, Mr. Shrieves acknowledged saying such things as "a million dollars for a smile," "Give me a kiss and you will be good to go," and "Yes, I love you if it will make you feel better." He maintained that such comments were intended to make Ms. Shavatt laugh. With regard

to his responses as indicated in the police report, Mr. Shrieves admitted at the hearing before the [ALJ] that the report was an accurate representation of what he said but he explained that his conversation was not necessarily in the order specified in the report.

2) One of the [ALJ's] reasons for dismissing the charges was Ms. Shavatt's reported demeanor immediately after the incident. The [ALJ] gives significant weight to the fact that Ms. Shavatt did not report the incident to her immediate supervisor, Ms. Joyner, and to the fact that Ms. Joyner testified she notice[d] nothing out of the ordinary in Ms. Shavatt's behavior and demeanor. However, the [ALJ] did not mention in her proposed decision Ms. Shavatt's explanation for the actions immediately after the incident. Ms. Shavatt testified that she was reluctant to report the incident to the Security Department at Perkins because Mr. Shrieves worked there. In addition, she did not want to advise Ms. Joyner of the incident because she and Mr. Shrieves were personal friends.

3) The [ALJ] faulted Trooper Jameson's investigation because he did not record his interviews or prepare verbatim transcripts. However, there is no requirement established on the record that Trooper Jameson had to record the interviews. The fact that Trooper Jameson interviewed Ms. Shavatt and Mr. Shrieves on November 14, 1991, the day after the incident occurred, and that Mr. Shrieves did not categorically deny the statements, lend persuasive weight to the reliability of the Trooper's investigation.

4) On page 28 of the proposed decision, the [ALJ] discusses a 1986 Equal Employment Opportunity (EEO) complaint that was filed against Mr. Shrieves by Ms. Kathy Helbig. The [ALJ] gives little weight to this complaint because the parties reached a settlement and Mr. Shrieves was not disciplined as a result of the complaint. According to the tape of the administrative hearing, Mr. Selby [the attorney representing Perkins] questioned Mr. Shrieves

about the complaint. Mr. Shrieves explained that he was not accused of anything by Ms. Helbig. According to Mr. Shrieves, Ms. Helbig filed the complaint against the agency. His only involvement was to testify as a witness. . . . The record clearly indicates that there was no finding that Mr. Shrieves sexually harassed Ms. Helbig in 1986. However, it is equally apparent that Mr. Shrieves'[s] involvement in this case goes well beyond that of "a witness."

The basis of the SOPD's decision may have been rejection of the ALJ's demeanor-based credibility determinations and substitution of other demeanor-based credibility determinations. If so, the SOPD failed to provide sufficiently strong reasons for her decision. For example, if the SOPD rejected the ALJ's finding that Mr. Shrieves was credible and substituted her own finding that he was insincere and that his testimony that he was joking was just a rationalization, she gave no adequate reason for doing so. *Compare with Chirino*, 849 F.2d at 1530 (finding that agency's reasons for reversing ALJ credibility determination were adequately supported by record).

The SOPD's decision, however, may have been based on "inferences drawn from the evidence itself" rather than from demeanor-based credibility determinations; if this was the case, then strong reasons for rejecting these determinations would not be necessary. *Penasquitos*, 565 F.2d at 1078; *see, e.g., Parker for Lamon*, 891 F.2d at 188–89; *Kopack*, 668 F.2d at 955–56. For example, the SOPD may have accepted all the ALJ's demeanor-based credibility determinations and nonetheless concluded that even though Mr. Shrieves intended to joke, there was abundant objective evidence, that Ms. Shavatt did not "welcome" the joke—*e.g.*, Ms. Shavatt's yell to be let out of the locked photo identification room, her written statement to the police the next day, her prompt filing of a criminal complaint—and so Mr. Shrieves's conduct constituted sexual harassment. Alternatively, for purposes of her decision, the SOPD may have accepted the ALJ's finding that Mr. Shrieves, Ms. Carter, and Ms. Joyner were credible and nonetheless

concluded that there was sufficient evidence from Mr. Shrieves himself that he had sexually harassed Ms. Shavatt— *e.g.*, his own admissions in the police report. The SOPD would not have needed to provide strong reasons for rejecting the ALJ demeanor-based determination as to credibility in these instances because the SOPD was certainly as able as the ALJ to make derivative inferences, *e.g.*, that there was objective evidence that Ms. Shavatt did not "welcome" the joke or that the police report contained admissions of sexual harassment; indeed, such derivative inferences are an area in which the agency is presumed to have greater expertise than the ALJ. *Pensaquitos*, 565 F.2d at 1079.

The problem is we simply do not know the basis for the SOPD's decision. The SOPD's statement that "Mr. Shrieves attempted to rationalize his actions" and her discussion of and additional finding as to Ms. Shavatt's demeanor after the incident indicate that perhaps the SOPD rejected the ALJ's demeanor-based credibility determination and made her own, without strong, or indeed any, reasons. On the other hand, the SOPD's repeated observation that Mr. Shrieves "never denied" Ms. Shavatt's accusations, and that he "admitted ... that the police report was accurate" and her entirely proper derivative inference that the police report was not to be disregarded because it was not a "verbatim transcript" indicate that perhaps the basis of her decision was not rejection of the ALJ's demeanor-based credibility determinations and substitution of her own, but other evidence. Nor do the possibilities stop here. Conceivably the SOPD's decision was based on the significance that she seemed to attribute to the Helbig complaint. This was another derivative inference that the SOPD was, of course, entitled to make. (Although the strict rules of evidence are not binding on an administrative agency, we do not suggest that a report of sexual harassment in 1986 could properly be the sole basis for a finding of sexual harassment in 1991).

■ Because we cannot determine the basis for the SOPD's decision, we must remand to the Secretary of Personnel for

further proceedings consistent with this opinion. The Court of Appeals has long recognized that such a remand is appropriate when the reviewing court cannot determine the basis for an administrative decision. *See, e.g., Forman,* 332 Md. at 221–24, 630 A.2d 753; *Harford County v. Earl E. Preston, Jr., Inc.,* 322 Md. 493, 505, 588 A.2d 772 (1991); *United Steelworkers of America, Local 2610 v. Bethlehem Steel Corp.,* 298 Md. 665, 679–81, 472 A.2d 62 (1984). *See also United States v. Chicago, M., St. P. & P. R.R. Co.,* 294 U.S. 499, 511, 55 S.Ct. 462, 467, 79 L.Ed. 1023 (1935) (a reviewing court must know "what a decision means" before it has any duty to determine "whether it is right or wrong"). On remand, the SOPD is to provide a "clear statement of the rationale" for her decision. *Forman,* 332 Md. at 221, 630 A.2d 753.

JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY VACATED; CASE REMANDED TO THAT COURT WITH DIRECTION TO REMAND THE CASE TO THE DEPARTMENT OF PERSONNEL FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

COSTS TO BE PAID ONE HALF BY APPELLANT AND ONE HALF BY APPELLEE.