785 A.2d 771

Louis V. GABALDONI

v.

BOARD OF PHYSICIAN QUALITY ASSURANCE.

No. 241, Sept. Term, 2000.

Court of Special Appeals of Maryland.

Nov. 28, 2001.

Conrad W. Varner (Varner, Kaslick & Goundry on the brief), Frederick, for appellant.

Thomas W. Keech, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Kimberly Cammarata, Asst. Atty. Gen. on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., SALMON, and RAYMOND G. THIEME, JR., (Ret., Specially Assigned), JJ.

SALMON, Judge.

 Under Maryland law, the final order of an administrative agency is subject to deferential review by the courts. *Carriage Hill Cabin John, Inc. v. Maryland Health Resources Planning Commission,* 125 Md.App. 183, 220, 724 A.2d 745 (1999). Deferential review prohibits a court from substituting its judgment for that of the agency if substantial evidence exists to support the agency's decision. *Banks v. Board of Physician Quality Assurance,* 354 Md. 59, 68, 729 A.2d 376 (1999). In applying these basic principles, an interesting question arises when an agency decides an issue after an Administrative Law Judge (ALJ) makes factual determinations with which the agency later disagrees. What a reviewing court should do under such circumstance was succinctly summarized by Judge Diana Motz, for this Court, in *Department of Health and Mental Hygiene v. Shrieves,* 100 Md.App. 283, 302–03, 641 A.2d 899 (1994):

[W]hen an administrative agency overrules the recommendation of an ALJ, a reviewing court's task is to determine if the agency's final order is based on substantial evidence in the record. In making this judgment, the ALJ's findings are, of course, part of the record and are to be considered along with the other portions of the record. Moreover, where credibility is pivotal to the agency's final order, [the] *ALJ's findings based on the demeanor of witnesses are entitled to substantial deference and can be rejected by the agency only if it gives strong reasons for doing so.* If, however, after giving appropriate deference to the ALJ's demeanor-based findings there is sufficient evidence in the record to support both the decision of the ALJ and that of the agency, the agency's final order is to be affirmed—even

if a court might have reached the opposite conclusion. This approach preserves the rightful roles of the ALJ, the agency, and the reviewing court: it gives special deference to both the ALJ's demeanor-based credibility determinations and to the agency's authority in making other factual findings and properly limits the role of the reviewing court.

(Emphasis added).

Earlier in *Shrieves,* Judge Motz made it clear that there is an important distinction between demeanor-based findings and derivative inferences, i.e., inferences drawn from the evidence itself. *Id.* at 299, 641 A.2d 899 (citing *Kopack v. National Labor Relations Board,* 668 F.2d 946, 953 (7th Cir.1982)). In this regard, the *Shrieves* Court, 100 Md.App. at 300, 641 A.2d 899, quoted *Penasquitos Village, Inc. v. National Labor Relations Board,* 565 F.2d 1074 (9th Cir.1977), with approval, as follows:

The [agency], therefore, is viewed as particularly capable of drawing inferences from the facts.... Accordingly, ... a [reviewing court] must abide by the [agency's] derivative inferences, if drawn from not discredited testimony, unless those inferences are "irrational," ... "tenuous" or "unwarranted." ... As already noted, however, the [agency], as a reviewing body, has little or no basis for disputing an administrative law judge's testimonial inferences.

*Id.* at 1079 (internal citations omitted).

The central issues that we must decide are two interrelated ones:

1. Whether the factual findings by the ALJ, which were rejected by the Maryland State Board of Physician Quality Assurance ("the Board") were "demeanor-based" factual findings and, if so,

2. Whether the Board set forth strong reasons for rejecting the findings of the ALJ.

To answer these questions, it is necessary to carefully review the testimony heard by the ALJ and to analyze the ALJ's precise findings and those of the Board.

Our review reveals that in several instances the Board made derivative inferences based on "not discredited testimony" in reaching different factual conclusions than those reached by the ALJ. The derivative inferences utilized by the Board were not "irrational," "tenuous," or "unwarranted." Moreover, to the extent the Board disagreed with demeanor-based findings of the ALJ, the Board set forth strong reasons for doing so. Therefore, we shall affirm the decision of the Board.

## I. *UNDISPUTED FACTS* [1]

Dr. Louis V. Gabaldoni is a board certified obstetrician and gynecologist (OB/GYN). Prior to the disciplinary action that is the subject of this appeal, Dr. Gabaldoni had never been the subject of any complaint to the Board and enjoyed an excellent professional reputation. At all times here relevant, Dr. Gabaldoni had a private practice in Hagerstown, Maryland, and was on the staff at the Washington County Hospital (WCH)—which is also located in Hagerstown. While on WCH's staff, Dr. Gabaldoni served as chairman of the OB/GYN department twice and served on the quality assurance, medical records, and ethics committees. WCH has no residents or house officers.

On November 5, 1997, the Board filed charges against Dr. Gabaldoni for alleged violations of several provisions of the Medical Practice Act ("the Act"). The Act is set forth in sections 14–401 *et seq.* of the Health Occupations article of the Maryland Code (1995 Repl.Vol.). Among other things, Dr. Gabaldoni was charged with having violated section 14–

---

1. Interspersed throughout the undisputed facts portion of this opinion are assertions regarding the appropriate standard of care as well as statements concerning matters of medical opinion. In this appeal, Dr. Gabaldoni recognizes that it was within the province of the Board to determine standard-of-care issues and resolve medical issues where the experts differed. Therefore, the facts are "undisputed" in the sense that Dr. Gabaldoni does not dispute them for purposes of this appeal— although at the hearing before the ALJ he took a different position as to some of those facts.

404(a)(22) of the Act by failing to meet the appropriate standard for the delivery of medical care.

The professional misconduct charges against Dr. Gabaldoni all related to the treatment he rendered to a young Hagerstown woman, who, for confidentiality purposes, will be referred to as Patient A.

Patient A came under Dr. Gabaldoni's care on November 28, 1994, when she was pregnant with her first child. Toward the later phase of her pregnancy, Patient A developed pre-eclampsia.[2]

On July 8, 1995, at 5:11 p.m., Patient A, with Dr. Gabaldoni's assistance, delivered a healthy baby boy. After delivery, Patient A began to hemorrhage due to uterine atony[3] and retained placental fragments. Patient A, due to hemorrhaging, lost more than 600 cc's of blood. Any blood loss over 500 cc's is considered excessive, especially in persons, such as Patient A, who are already anemic.[4] Tachycardia (abnormally high heart rate) is a symptom of anemia. In an anemic patient, the heart sometimes races in an attempt to adequately oxygenate the body's organs. Severe anemia, left untreated, can lead to deterioration of the heart muscle, causing decreased pumping ability, which can lead to congestive heart failure. Shortness of breath, fatigue, dizziness, and headache are symptoms often seen in anemic patients.

At 7:35 p.m., which was a little over two hours after her baby was delivered, Patient A expelled a large blood clot, which caused her blood pressure to fall to 67/42. At 8:30 p.m., Dr. Gabaldoni was called at home from WCH. He ordered

---

**2.** Pre-eclampsia is evidenced by the development of hypertension (140/90 or greater) with proteinuria (protein in the urine of over 300 mgs.) or edema (swelling of the extremities), or both. It is frequently caused by pregnancy or the influence of a recent pregnancy; pre-eclampsia most frequently occurs after the 20th week of gestation.

**3.** Uterine atony is a condition in which the uterus does not contract sufficiently to put pressure on the blood vessels.

**4.** Anemia is a quantitative deficiency of the hemoglobin, often accompanied by a reduced number of red blood cells.

that hospital personnel caring for Patient A draw blood and do a complete blood count (CBC) the next morning. The standard pre-printed orders, which were already in Patient A's chart, also called for a CBC in the morning.

### Sunday Morning—July 9, 1995

On July 9, at 8:30 a.m., Sheryl Gray, a registered nurse employed at the WCH, phoned Dr. Gabaldoni at home and told him that the hospital lab had reported that Patient A's CBC results showed that she had hemoglobin levels of 5.4 and a hematocrit of 14.8. These readings indicated a severe level of anemia. More specifically, it showed a lack of red blood cells so critical that the standard of care called for a CBC, including hematocrit and hemoglobin ("HEH"), within four hours of 7:00 a.m., followed by an immediate transfusion if the hematocrit did not rise.[5]

At 8:30 a.m., Dr. Gabaldoni ordered that CBC levels be checked again at 5:00 p.m. At 10:35 a.m., however, Dr. Gabaldoni, after again talking with Sheryl Gray, ordered that a CBC be done at noon that day. He also ordered that Patient A be typed and cross-matched for blood and ordered that her orthostatic blood pressure be checked regularly.[6]

### Sunday Afternoon—July 9; Monday—July 10

The lab results were reported to the WCH nursing staff at 12:30 p.m. on July 9. Patient A's hematocrit reading at that point was 14.0. This level was so low that Patient A's organs were no longer being oxygenated properly. At this hematocrit level, the standard of care requires that the attending physician, in this case Dr. Gabaldoni, inform the patient that she remained extremely anemic and definitely needed a blood

---

5. Any hematocrit reading below 35 is considered low.

6. Orthostatic blood pressure is a method of taking a patient's blood pressure while the patient is sitting and standing to determine whether the person is losing blood, or does not have enough oxygen in the blood, or is otherwise not tolerating the low blood volume.

transfusion to avoid a grave risk of serious adverse medical consequences.

The standard of care also required that Dr. Gabaldoni order a blood transfusion as soon as he received the hematocrit reading of 14.0, provided, of course, that Patient A consented. Dr. Gabaldoni did not receive the consent of his patient for a blood transfusion until 9:20 a.m. on Monday, July 10.

The main factual questions that confronted the ALJ, and later the Board, was whether Dr. Gabaldoni ever adequately explained to Patient A the necessity of a transfusion at any time on July 9.

Dr. Gabaldoni visited Patient A on the afternoon of July 9 and again on the afternoon of July 10. What he told Patient A during these two visits and whether there were any other visits are issues that the parties vigorously dispute.

At 4:30 p.m. on July 10, Patient A experienced slight nausea, shortness of breath, and blurred vision. Less than three hours later, at 7:10 p.m., Patient A's condition worsened. Her blood pressure was very high (162/104), as was her pulse rate (124 beats per minute) and she needed to lean forward in order to breath. The nursing staff observed that she was "shaky" and short of breath. There were crackles [7] in her lungs, indicating a build up of moisture in the lungs.

On July 10, Brenda Horsch, a registered nurse at WCH, who began attending Patient A, at 7:00 p.m., phoned Dr. Gabaldoni at 7:20 p.m. Dr. Gabaldoni returned Nurse Horsch's call at 7:30 p.m. She advised Dr. Gabaldoni of Patient A's condition. Dr. Gabaldoni ordered a CBC and arterior blood gases to be done as soon as possible.

About this same time, the exact hour is not shown, Dr. Gabaldoni telephoned Dr. Dino Delaportas, a board certified infectious disease and internal medicine specialist. Dr. Delaportas is a colleague and friend of Dr. Gabaldoni. In this

---

7. "Crackle" is a catch-all term that means there is an extra breath sound.

phone conversation, Dr. Gabaldoni explained Patient A's condition and asked Dr. Delaportas whether Patient A might have a pulmonary embolism or blood clot. Dr. Delaportas told Dr. Gabaldoni that Patient A's anemia was her main problem, not pulmonary embolism. He also told Dr. Gabaldoni that it was very important that he convince Patient A to have a blood transfusion immediately and recommended that in the interim he give her some Lasix and oxygen.

The lab tests that Dr. Gabaldoni ordered at 7:30 p.m. were given to Nurse Horsch at 7:45 p.m. and reported to Dr. Gabaldoni at 8:20 p.m. The test results showed that Patient A's hematocrit had fallen to 13.5 and her hemoglobin was 4.7. These were very low H & H levels.[8] The arterial oxygen content of Patient A's blood was 56, which was also extremely low. Normal arterial oxygen readings should be in the 90's. When these results were reported to Dr. Gabaldoni at 8:20 p.m., the doctor instructed Nurse Horsch to tell Patient A that she should "strongly reconsider" accepting blood. Nurse Horsch, at 8:30 p.m., offered Patient A a blood transfusion. She also explained to Patient A and her husband the risks and benefits of the procedure. At that point, patient A and her husband did not immediately agree to a blood transfusion, although they did not flatly refuse one. Instead, they asked Nurse Horsch if they could wait until the respiratory therapist consulted with Dr. Gabaldoni before making a decision. At 9:20 p.m., Patient A gave her consent to a blood transfusion, and the first transfusion was begun at 9:25 p.m. At the time the blood transfusion started, Patient A was in severe respiratory distress.

### Late July 10 to 11:00 a.m. on July 13, 1995

The first unit of blood was infused over a period of four hours while Patient A was still in distress and still anemic. The second unit was infused starting at 2:35 a.m. and finishing at 4:05 a.m. on July 11, which was more than twice as fast as

---

8. Patient A's pre-delivery H & H levels were 27.5 (hematocrit) and 9.8 (hemoglobin).

the first unit had been infused. Infusing blood too rapidly can cause an anemic patient's heart to go into congestive heart failure.

At 3:55 a.m. on July 11, Nurse Horsch again called Dr. Gabaldoni at home to report to him that there had been no improvement in Patient A's condition. Next, at 4:05 a.m., Nurse Horsch once more called Dr. Gabaldoni, reporting that Patient A's condition was worsening, that she now had crackles in both lungs, front and back, all the way up. Dr. Gabaldoni immediately spoke to one of Nurse Horsch's supervisors, Lorna Thomas, R.N., who had, on her own, called in a respiratory technician to attend Patient A. After talking to Nurse Thomas, Dr. Gabaldoni ordered Lasix and some other medications. He was reassured by what Nurse Thomas told him about Patient A, and therefore he did not come to the hospital at that point, nor did he consult with a specialist in emergency medicine.

Patient A's condition continued to deteriorate. Nurse Horsch called Dr. Gabaldoni around 4:45 a.m., telling him that Patient A was ashen in color, unresponsive, and sweating. She also told Dr. Gabaldoni that it was urgent that he come to the hospital. Dr. Gabaldoni, who lives about 20 minutes from the hospital, left immediately and on his car phone spoke to Nurse Thomas at 4:50 a.m. He arrived at the hospital at 4:55 a.m., at which point Patient A had gone into respiratory arrest and was being administered CPR.

Patient A was intubated incorrectly by hospital personnel who administered CPR. The intubation tube was entered into her esophagus rather than her trachea, which caused her to be deprived of oxygen for about thirteen minutes.

Patient A was transferred to the intensive care unit of the WCH, and later, on July 11, transferred to the University of Maryland Hospital, where she died on July 13, 1995, at 11:00 a.m.

### Cause of Death

The Office of the Chief Medical Examiner, after reviewing the autopsy findings and viewing all medical records and

investigative information, issued a report on September 11, 1995, which concluded that the cause of Patient A's death was that she had suffered sudden onset of cardiac arrhythmia, which had occurred because of postpartum hemorrhage superimposed on a low hemoglobin level prior to delivery. Her original death certificate was amended to show that the immediate cause of death was cardiac arrhythmia with postpartum hemorrhage and anemia of pregnancy.

## II. *CONTENTS OF DR. GABALDONI'S PROGRESS NOTES*

When Patient A was transferred to the University of Maryland Hospital on July 11, so were her medical records ("the original records"). Dr. Gabaldoni's original progress notes read, in material part, as follows:

> 7/9/95—VSS (vital signs stable)[,] aferbrile (no fever)[,] HCT [hematocrit] 14.5[sic][,] abdomen soft[.] ... vagina dry (no bleeding)[,] feels dizzy[,] plan[:] CBC ... orthostacics[,] consider transfusion.

> 7/10/95—VSS[,] aferbrile[,] HTC 14.5[sic][,] ... vagina dry[,] no dizziness now[,] refuses transfusion[,] continue H & H [hemoglobin and hematocrit testing] ...

Two days after Patient A's death, Dr. Gabaldoni made changes to his progress notes. The changes were made in the same color ink as the original progress notes—blue ink for the July 9 entry and black ink for the July 10 entry. These changes were made in such a manner that the alterations would not be readily apparent.

Under the entry for 7/9/95, Dr. Gabaldoni wrote, "1:00 p.m." in the margin and added these words:

> No orthostatic changes in BP (blood pressure) or pulse. The patient still refused transfusion[,] will continue with H/H's[,] iron, PC and regular orthostatic checks.

Under the entry for 7/10/95, Dr. Gabaldoni (1) added: "A.M." in the margin, (2) added the words "feels much better" between the phrases "no dizziness now" and "refuses transfu-

sion," and (3) added the words "consider transfusion at later date" at the end of the entry.

## III. *THE ADMINISTRATIVE LAW JUDGE'S CONCLUSIONS*

Saundra Spencer, the ALJ who heard this case, concluded that Dr. Gabaldoni had appropriately advised Patient A of the need for a blood transfusion on the morning of July 9, 1995, but Patient A nevertheless refused to have that transfusion until 9:20 p.m. on July 10. She also concluded that, after the July 9 morning visit, Dr. Gabaldoni repeatedly advised his patient to have a transfusion but the advice was consistently rejected up until 9:20 a.m. on July 10.

The ALJ opined that, although the Board did establish that Dr. Gabaldoni had failed to properly make additions to his progress notes and did not accurately reflect in those notes the severeness of Patient A's condition, no sanctions were warranted. She noted that, since Patient A's death, Dr. Gabaldoni had already taken continuing medical education courses concerning appropriate record keeping. As a consequence, no sanctions should be imposed due to his record keeping lapses because, if sanctions had been imposed, the sanction would have been duplicative, i.e., would have required him to attend the medical education classes he had already attended.

## IV. *THE BOARD'S CONCLUSIONS*

The conclusions of the Board were as follows:

Dr. Gabaldoni's postpartum treatment of Patient A violated the standard of care.

Dr. Gabaldoni should have been aware that this anemic patient who lost an abnormally high amount of blood at delivery required closer monitoring of her blood count than the normal patient. He did not order any special or more frequent monitoring at first. When the first postpartum hematocrit results of 14.8 came back at 8:30 a.m. on July 9th, he should have realized that these results showed that

Patient A's blood count was critically low and she was at risk of cardiac decompensation, and he should have ordered a transfusion at that point.

At the very least, Dr. Gabaldoni should have acted at once when the second hematocrit reading of 14.0 was recorded at 12:00 noon on July 10th [sic]. Patient A was at this point not oxygenating her organs, and any competent physician should have recognized the crucial need for a blood transfusion. Dr. Gabaldoni did not order a blood transfusion and did not even order further H & H testing until 7:30 p.m. on the following day. During this period, Patient A frequently displayed many of the symptoms of severe anemia, including tachycardia, shortness of breath, vomiting and dizziness.

Dr. Gabaldoni did not request that any nurse offer Patient A a blood transfusion until after 8:20 p.m. on July 10th, after cardiac decompensation had begun and Patient A was in respiratory distress. Dr. Gabaldoni had no conversations with Patient A or her family in which he informed her that she definitely needed a blood transfusion to avoid the risk of serious adverse medical consequences.

Dr. Gabaldoni also breached the standard of care when, after being repeatedly informed, between 7:20 p.m. on July 10th and 4:05 a.m. on July 11th, of Patient A's worsening laborotory [sic] results, respiratory distress and rapidly decompensating condition, he failed to assure that a physician, either himself or a consultant physician, was available in person to manage her care at this critical point.

The Board has consistently held that the creation of an accurate medical record is a part of the standard of care required of all physicians. The records which Dr. Gabaldoni created with respect to July 9th and July 10th violate this standard of care. The records were inaccurate in that they recorded an incorrect hematocrit level, because the time ("A.M.") was inaccurately recorded for July 10th, because the record for both dates incorrectly reported that continued H & H testing had been ordered, and because the record of July 9th incorrectly stated that Patient A refused

a transfusion. (*See* discussion at Section III of this decision.)

The creation of these records also violated the standard of care because Dr. Gabaldoni added notations to these records two days after Patient A's death in a way which did not indicate that these additions were added later. The standard of care requires that later additions be dated as to when made, and clearly shown as later additions.

Dr. Gabaldoni not only failed to note that the additions were added later; he also used two different pens, a blue pen which matched the blue ink on the original note concerning July 9th and a black pen which matched the black ink used on the original note concerning July 10th. In addition, for July 10th, Dr. Gabaldoni's additions were interspersed throughout the note, from beginning to end, in such a way that it would be natural to mistake the record as one which had been written all at one time. This type of record-keeping violates both the letter and the spirit of the standard of care enunciated above. And the changes made are obviously of critical significance.

Based on these conclusions, the Board found that Dr. Gabaldoni had "failed to meet the appropriate standard for delivery of medical care," within the meaning of section 14–404(a)(22) of the Act. The Board issued Dr. Gabaldoni a reprimand for his violation.

## V. *THE TRIAL COURT'S RULING*

Dr. Gabaldoni filed, in the Circuit Court for Baltimore City, a petition for judicial review. The matter was assigned to the Honorable David Ross. On March 16, 2000, Judge Ross ruled that the Board did not abuse its discretion in overruling the decision of the Administrative Law Judge.

## VI. *ISSUES PRESENTED*

As phrased by appellant, the issues presented are:

I. Whether the decision of the lower court was erroneous because it relied on an improper standard of review.

II. Whether the Board gave appropriate deference to, and strong reasons for, overturning the credibility-based findings of the Administrative Law Judge.

█ We shall not address the first issue raised by appellant because, in an administrative appeal, it makes no difference whether or not the trial judge applied the correct standard for review. "Our role in reviewing the decision of an administrative agency is precisely the same as that of the circuit court." *Consumer Protection Div. v. Luskin's, Inc.,* 120 Md.App. 1, 22, 706 A.2d 102 (1998), *rev'd on other grounds,* 353 Md. 335, 726 A.2d 702 (1999). We, therefore, do not evaluate the findings of fact and conclusions of law made by the circuit court; instead, "[w]e review the administrative decision itself, . . . and not the decision of the trial court." *Id.; see also, Giant v. Department of Labor* 124 Md.App. 357, 363, 722 A.2d 398 (1999).

### VII. *ANALYSIS*

A close reading of the decision of the Board, quoted *supra,* shows that the Board found that Dr. Gabaldoni breached the standard of care in several distinct ways. For convenience, we shall separately label each alleged breach.

Breach A: Immediately after Patient A delivered her baby, Dr. Gabaldoni should have ordered closer monitoring of Patient A than of a normal patient because she was severely anemic and had lost a great quantity of blood. Moreover, he should have ordered that her H & H be tested regularly. Although on the morning of July 9 he did order an H & H test for noon of that day, he failed to order a further H & H test until 7:30 p.m. on July 10.

Breach B: Between 7:30 p.m. on July 10 and 4:05 a.m. on July 11, he failed to make sure that either he or a "consulting physician" was available in person to manage Patient A's care.

Breach C: Two days after the patient died, he added notations to the records in such a way that it would not be clear to a reader of the progress note that additions had been made.

Breach D: Dr. Gabaldoni created inaccurate medical records inasmuch as the records inaccurately recorded the hematocrit on two occasions.

Breach E: He incorrectly reported twice that continued H & H testing had been ordered.

Breach F: His progress notes incorrectly stated that Patient A refused a transfusion.

Breach G: He had no conversation with Patient A (or her family) in which he informed the patient that she definitely needed a blood transfusion "to avoid the risk of adverse medical consequences;" he should have given her this advice, at the latest, on the afternoon of July 9.

In his brief, Dr. Gabaldoni argues:

The Board blatantly rejected the ALJ's credibility findings on the key issues that form the basis of the reprimand. Whether the [a]ppellant told the patient that she needed a blood transfusion, whether he personally attended the patient on July 9 and July 10, and whether his records accurately reflected what was done, are credibility issues ... that go to the very center of the controversy in this case.

This argument is somewhat misleading. It implies that the only "big issues" upon which the Board based its decision to reprimand Dr. Gabaldoni were the ones concerning what and when Dr. Gabaldoni told Patient A about her need for a blood transfusion. But the breaches of the standard of care that we have labeled A, B, C, D, and E also formed the basis of the reprimand. None of those adverse findings had anything whatsoever to do with what Dr. Gabaldoni told Patient A. To reach the conclusion that Breaches A–E occurred, the Board did not have to make credibility determinations. The Board simply utilized its collective expertise and enunciated the appropriate standard of care; the Board determined, based on facts shown in Patient A's chart, that Dr. Gabaldoni breached

the standard of care.[9]

Breaches F and G do involve, at least to some extent, rejection of the ALJ's credibility assessments of certain witnesses by the Board. Technically speaking, whether Breaches F and G occurred depends, in large part, upon what Dr. Gabaldoni did, and what he advised Patient A and her family on only one date, *viz,* July 9. But, to a minor degree, as to Breach F (the record keeping issue) the Board's findings involve activities up until the afternoon of July 10. We will therefore discuss the difference between the conclusions of the ALJ and those of the Board as to what transpired on both July 9 and 10.

### A. *July 9, 1995*

Dr. Gabaldoni testified that on the morning of July 9, sometime before 10:30 a.m., he had an extensive conversation with Patient A, in the presence of her husband, about the need for an immediate blood transfusion. According to Dr. Gabaldoni, he told the couple that Patient A was in a dangerous situation and urgently needed an immediate transfusion. He did not, however, tell her that she might die without a transfusion because he did not want to unduly frighten her. According to Dr. Gabaldoni, both Patient A and her husband had a fear of AIDS and other blood-borne diseases; this fear caused Patient A to refuse to have a blood transfusion.

Patient A's husband denied that Dr. Gabaldoni either talked to his wife or even came into Patient A's room on the morning of July 9. Patient A's mother testified that she talked to her daughter on the phone repeatedly, on July 9 and 10, and sat with her for five hours on July 10. According to Patient A's mother, her daughter told her that she had not spoken to Dr. Gabaldoni at any time concerning a transfusion.

Sheryl Gray, R.N., testified that she worked a sixteen-hour shift on July 8 and 9, 1995, at the WCH. Her shift started at

---

9. In this appeal, Dr. Gabaldoni does not contend that the Board was mistaken as to the appropriate standard of care.

7:00 p.m. on July 8 and she finished about 11:00 a.m. on the 9th. During that shift, Patient A was her only patient. At 8:30 a.m. on July 9, Nurse Gray phoned Dr. Gabaldoni and told him of the lab results from the 7:00 a.m. H & H test. Dr. Gabaldoni ordered an H & H test be repeated at 5:00 p.m. that day.

Shortly after she found out about the 14.8 hematocrit result, Nurse Gray had a conversation with Patient A and her husband in which she told them that because the blood count was low, Patient A should not "be surprised if Dr. Gabaldoni comes in and offers . . . [you] a blood transfusion." At that point, Patient A's husband asked some questions about a transfusion, which Nurse Gray characterized as "normal conversations about blood," i.e., questions were asked about the source of the blood and about whether the patient was likely to contract HIV or hepatitis from a transfusion. Nurse Gray testified that Patient A did not refuse a blood transfusion at that point because none was being offered; Nurse Gray simply was alerting the couple that a blood transfusion might be suggested by Dr. Gabaldoni.

Nurse Gray further testified that during the first four hours of the shift, she never left Patient A's room because Patient A and her baby needed so much care. Thereafter, she was in the patient's room "almost my entire shift." Nurse Gray did not recall ever seeing Dr. Gabaldoni in Patient A's room during her shift.

At the end of her 16 hour shift, on July 9, when she was reporting to Lucille Ecker, the nurse who was about to take over for her, Nurse Gray recalled seeing Dr. Gabaldoni "in the nurse's section in front of the chart rack as he [Dr. Gabaldoni] was coming in" and she was about to leave. At that point Nurse Gray gave Dr. Gabaldoni an oral report about her care of Patient A over the previous sixteen hours. When she concluded her report, Dr. Gabaldoni changed his previous order and directed that a CBC be obtained at 12 noon—rather than at 5:00 p.m. During this conversation, Nurse Gray and

Dr. Gabaldoni did not discuss the possibility of Patient A having a blood transfusion.

When Nurse Gray was cross-examined by Dr. Gabaldoni's counsel about when she had first seen the doctor on the morning of July 9, Nurse Gray said:

At the time he would have been coming through, he was coming around into the nurses' station, I was entering from the other end. Our nurses' station has two entrances, one from the front of the hall and one from—I mean towards the front of the hall and one towards the back that goes around like a semicircle.

So, I came from the patient's room, which is beyond the nurses' station, up towards the front; he was coming in towards the middle. We would have been right in front of the chart rack.

Nurse Ecker, who came on duty at 7:00 a.m. on July 9 and worked until 7:00 p.m. that evening, took over as Patient A's nurse at 11:00 a.m. She was in Patient A's room "numerous times" between 11:00 a.m. and 7:00 p.m. but never saw Dr. Gabaldoni in Patient A's room during her shift. Patient A's husband, however, was present throughout—according to Nurse Ecker.

Nurse Ecker recalled that she saw Dr. Gabaldoni at the nurses' station at the hospital about 11:00 a.m. on the 9th. In this regard, she testified as follows:

Dr. Gabaldoni had been in making his morning rounds and was there at the time of report. You know, in fact, I don't know whether he was at the desk right at that time when Sheryl [Gray] was reporting to me, but he did turn to me and say that he would be calling me for the results of the blood work as well as the orthostatic blood pressures.

Q [COUNSEL FOR THE BOARD]: When was that?

A: That was approximately around 11:00, in that vicinity, because I got the report [from Nurse Gray] probably about quarter of 11:00—to 11:00, in that time span there. Sheryl was due to go off at 11:00.

Later, however, Nurse Ecker made it clear that she did not see Dr. Gabaldoni making his rounds because she had been

busy with [her] patients and, at eleven o'clock, "they were giving me more patients." In her words, Dr. Gabaldoni "could have been back [in] the hall for the past half-hour [before eleven o'clock], and I maybe would not have seen him."

According to Nurse Ecker, she received the lab results of the second CBC (including the H & H) shortly after noon on the 9th. Even though the lab results showed that Patient A had a 14.0 hematocrit, she did not immediately call Dr. Gabaldoni with the results because he had told her in their 11:00 a.m. conversation that he would call her. Between 2 and 4:00 p.m., she had a conversation with Patient A and her husband. She told them that there was a "likely chance" that Dr. Gabaldoni would want to give Patient A a blood transfusion that evening. The couple questioned Nurse Ecker as to whether blood transfusions were safe. Nurse Ecker advised them that, to the best of her medical knowledge, the transfusions were very safe. Later, about 5:30 p.m., when she called Dr. Gabaldoni to ask him for a prescription for Patient A's nausea, she told Dr. Gabaldoni of the 14.0 hematocrit result. In that conversation, Nurse Ecker asked Dr. Gabaldoni whether he was going to give Patient A blood that evening, and he said, "No, not at that point." Nurse Ecker told Dr. Gabaldoni that the patient and her husband "had concerns about the safety of blood and would like to talk to him [Dr. Gabaldoni] before he gave it. . . ."

The ALJ made the following factual findings that are of interest: "Nurses Gray and Ecker saw the [r]espondent at the nurses' station in LDRP unit between 10:45 a.m. and 11:00 a.m.[on July 9]. He had been seeing his patients."

In the "Discussion" portion of the ALJ's decision, she said:

The evidence of record establishes that the [r]espondent recognized the need for a transfusion on July 9, 1995 and indeed, offered it to the [p]atient [on the morning of July 9]. The [p]atient, however, refused the transfusion. The record further establishes that at 12:00 p.m. on July 9, 1997, the [r]espondent ordered that Patient A be typed and cross-matched for two units of blood.

Further evidence that the Patient was offered a transfusion on July 9, 1995 and refused it is found in the nursing notes and the testimony of the nurses. Nurse Gray testified that on July 9, 1995, she had a conversation with the [p]atient and her husband about a transfusion and that they both expressed concerns about receiving a transfusion. Another nurse, Nurse Ecker, also testified that she talked to the [p]atient and her husband about receiving a blood transfusion and they expressed hesitation because of concerns regarding the safety of the blood. Also, on July 9, 1995, Nurse Helgren had a discussion with the [p]atient and her husband about receiving a transfusion and they told her that they preferred not to receive a transfusion.[10]

As noted by the Board's expert, the standard of care would require that the [r]espondent offer Patient A transfusion on July 9, 1995. The [r]espondent did offer the [p]atient a transfusion on July 9, 1995 and thus complied with the standard of care.

\* \* \*

The Board presented the testimony of Patient A's mother and husband who contended that the [r]espondent did not

---

**10.** Nurse Helgren did testify that on the evening of July 9 she discussed with Patient A and her husband the possibility of having a transfusion, but she did not testify that Patient A or her husband told her "they preferred not to have a transfusion." Counsel for Dr. Gabaldoni, on cross-examination, asked Nurse Helgren whether she had told an investigator that she had talked to Patient A and her husband and that they said "that they preferred not to receive a transfusion." Nurse Helgren said that she could not remember having made that statement. A question, standing alone, does not, of course, constitute evidence or establish any fact.

On direct examination Nurse Helgren testified as follows:

Q [Ms. O'Donnell]: And what did you discuss, if you recall?

A: Basically they just said that they were, you know, kind of hesitant to have blood and, you know, I told them that yeah, if I needed blood, I probably would be hesitant, too, but that, you know, at the point-at that point, we had no order for anything, so that the discussion stopped there.

Q: What, if anything, did they say about the fact that they would not take blood if it had been offered?

A: We did not discuss that.

see Patient A after the delivery of the baby. This testimony is in conflict with the testimony of the Nurses Gray and Ecker who testified that the [r]espondent was on the ward seeing patients on July 9, 1995. While the nurses could not verify that the [r]espondent visited Patient A, their testimony, that he was on the ward, is in direct conflict with the testimony of the patient's mother and husband who testified that the [r]espondent did not visit the patient. The testimony of the patient's mother and husband is also in conflict with the [r]espondent's progress notes that establish that the [r]espondent visited Patient A on July 9 and July 10, 1995.

The Board rejected the ALJ's conclusion that appellant had advised Patient A and her husband of the need for a transfusion on the morning of July 9. This finding is of paramount importance because the standard of care required that Dr. Gabaldoni advise his patient, on the morning of July 9, of the urgent need for a transfusion.

The Board gave several reasons for disagreeing with the ALJ's conclusion in this regard. First, in the Board's view, contrary to the ALJ's finding, the testimony of Nurse Gray and Nurse Ecker did not support Dr. Gabaldoni's testimony that he had a conference with Patient A and her husband between 8:30 and 10:30 a.m. on July 9. The Board said:

Nurse Gray testified that she worked from 7:00 p.m. on July 8 until 11:00 a.m. on July 9. There is only one usable entrance to the labor and delivery area, and one cannot enter it without passing directly by the nurses' station. Patient A was Nurse Gray's only patient during her entire shift. Nurse Gray testified that she did not see Dr. Gabaldoni at all during her shift. She further testified that Patient A's needs were so extensive that she spent the first four hours of her shift entirely in Patient A's room, and that she spent almost all of the rest of her shift in Patient A's room with Patient A, Patient A's husband and the baby. Nurse Gray testified that Dr. Gabaldoni did not visit Patient A at any time during that shift.

At the end of her shift, at 11:00 a.m. on July 9, Nurse Gray observed Dr. Gabaldoni enter the labor and delivery suite from the outside doors and stop at the nurses' station. She relayed Patient A's condition to Dr. Gabaldoni at the nurses' station. This was the first time that she had seen him that day.

\* \* \*

Nurse Gray also testified that Dr. Gabaldoni did not order a transfusion, nor did he ask her to talk to Patient A about a transfusion. Although all of Dr. Gabaldoni's other orders appeared to be faithfully recorded throughout the hospital records from July 8 through July 11, no orders are recorded for a blood transfusion or for any offer of a blood transfusion to be made on July 9.

In regard to Nurse Ecker's testimony, the Board made the following observations:

The testimony of Nurse Ecker does not, as the Administrative Law Judge states, support Dr. Gabaldoni's testimony in this regard. Patient A was transferred to the care of Nurse Ecker at 11:00 a.m. on July 9. At the time that Nurse Gray was transferring this patient to Nurse Ecker, Nurse Ecker observed that Dr. Gabaldoni was standing there, at the nurses' station. Although she first testified that Dr. Gabaldoni had done his rounds, she later stated that he had done his rounds "apparently . . . because he was at the nursing station." She hadn't seen Dr. Gabaldoni anywhere before this point, nor did she ever see Dr. Gabaldoni with Patient A. In light of Nurse Sheryl Gray's testimony, that Dr. Gabaldoni was indeed at the nurses' station at 11:00 a.m., but that he had just arrived through the outside doors and had not been on the unit at all prior to that time, Nurse Ecker's testimony does not detract from all of the other consistent testimony on this issue. Nurse Ecker's testimony thus does not contradict Nurse Gray's, or the husband's, or the mother's testimony, nor does it support the testimony of Dr. Gabaldoni.

The Board also concluded that Dr. Gabaldoni's testimony that he saw Patient A on the morning of July 9 was undermined by his original notes. Thus, the Board rejected the ALJ's opposite conclusion. The Board explained that, originally, the notes did not indicate *when* on July 9 he had seen the patient. Moreover, the notes contained errors in that the hematocrit was never "14.5." Moreover, Patient A, who was consistently tachycardic, could not be accurately characterized as having stable vital signs. Lastly, Dr. Gabaldoni did not say in his original notes that he advised Patient A of her urgent need for a transfusion. Instead, he merely wrote, "consider transfusion." As the Board pointed out, Dr. Gabaldoni's own expert testified that this entry ordinarily would be interpreted to mean that Dr. Gabaldoni was considering a transfusion as part of his plan—not that Patient A had been offered a transfusion and refused it.

Dr. Gabaldoni contends that the ALJ's finding that he did advise Patient A of her need for a transfusion on the morning of July 9 was exclusively "demeanor based" within the meaning of the *Shrieves* case. We disagree. The ALJ's decision to believe Dr. Gabaldoni and disbelieve Patient A's husband and mother was not entirely demeanor based. The clearest example of this is when the ALJ explains why she rejected the testimony of Patient A's husband and mother, i.e., that their testimony was in "direct conflict" with the testimony of Nurses Gray and Ecker, "who [allegedly] testified that [r]espondent was on the ward seeing patients on July 9, 1995." The Board's summary of the testimony of Nurse Gray and Nurse Ecker, recited above, is accurate. The nurses did not corroborate Dr. Gabaldoni's testimony that he was "on the ward seeing patients" on July 9. The ALJ had her facts wrong. As the Board forcefully pointed out, the testimony of those two nurses undermines, rather than supports, Dr. Gabaldoni's testimony that he had a pre—10:30 a.m. visit with Patient A on July 9, in which he had an extensive conversation regarding the need for an immediate blood transfusion. The reason that the nurses' testimony undermines Dr. Gabaldoni's testimony is the inherent unlikelihood that if such a visit occurred around

10:30 a.m.—as Dr. Gabaldoni says—that Nurse Gray would not have seen him in the room of her only patient—a derivative inference that the Board was entitled to make.

Although the ALJ did not say so, it may well be that the ALJ's decision to believe Dr. Gabaldoni rather than Patient A's husband or mother (as to the July 9 morning visit) was in some part demeanor-based. But in addition to the fact that Nurse Gray's and Nurse Ecker's testimony did not contradict Patient A's mother or husband, a strong reason for disagreeing with the ALJ's credibility assessment is found in the original progress notes. If a patient was known to be in great danger and a doctor had advised his patient of that danger and the need for an immediate life-saving transfusion, why would the doctor neglect to document the refusal in the progress notes? Or, why would he write "consider transfusion" if he had advised the patient of the urgent need for a transfusion? As the Board pointed out, the original notes, contrary to the ALJ's conclusion, in no way support the fact that a morning visit took place because the note simply set forth the date but did not say whether the visit was in the A.M. or P.M.

Additionally, the Board correctly noted that Dr. Gabaldoni never asked Nurse Gray to talk to Patient A about a transfusion. The Board inferred, apparently, that if Dr. Gabaldoni had seen this seriously ill patient on the morning of July 9 he would have mentioned this to the nurse and asked her to try to get the patient to change her mind.[11]

To have appropriately advised Patient A of the immediate need for a blood transfusion, Dr. Gabaldoni would have to have appreciated the urgency of the situation. The Board inferred that Dr. Gabaldoni must not have understood the gravity of the matter on the morning of July 9, because, after talking to Nurse Gray, he ordered an orthostatic blood test. In the opinion of the Board, with a hematocrit level of 14.8,

---

11. As Nurse Gray testified, the order to move up the CBC test from 5:00 p.m. to noon was a result of her report to Dr. Gabaldoni at the end of her shift.

orthostatic blood pressure "becomes irrelevant." This finding was supported by expert testimony presented to the Board [12] and was still another reason to believe that no morning visit occurred on July 9.

## B. *Afternoon Visit of July 9, 1995*

Dr. Gabaldoni testified that he saw Patient A "around noon to 1:00 p.m." on July 9. He admitted that he made no progress note of this second visit on the 9th. Nevertheless, he claims that his revised progress note accurately reflects what happened during that visit. His testimony in regard to the afternoon visit was extremely limited. He did not say exactly what the conversation was between himself and Patient A during the afternoon visit; he did, however, testify that Patient A was "still refusing this very vital transfusion" on the afternoon of July 9.

In regard to the afternoon visit, the ALJ simply says in her finding of fact that "[t]he respondent also checks on Patient A again in the afternoon [of July 9]." The ALJ and the Board are not at odds in this regard. The Board said:

A visit to Patient A by Dr. Gabaldoni on the afternoon of July 9, 1995, could have happened, and the Board will give

---

12. Dr. Claire Weitz, an expert in the field of obstetrics, testified as followed:

The other thing is, performing orthostatic blood pressures on someone who is so anemic, actually postpartum women who have experienced a blood loss, it is considered at least a relative contraindication to perform tilt and orthostatic blood pressure since one can induce an actual significant problem, and you know someone who's got a hematocrit of 13.5 or 14 is going to have symptoms. Dropping a hematocrit from 28 to 14.

To me, the issue of use of orthostatics are for indications where someone may have a drop in their hematocrit, you're trying to assess the need for maybe a one-unit transfusion, but they're not severely anemic to this degree. I mean, hematocrits of 20.19, you might want to utilize things like that to find your fine line between giving a transfusion or not. *There is no question in my mind that with a hematocrit of 14, I don't care what the orthostatics are. This woman either needs to get blood or document a refusal to get blood, because she's going to die.*
(Emphasis added).

the benefit of the doubt to Dr. Gabaldoni that a short visit took place. Dr. Gabaldoni testified that he was unsure of when he made the visit. He appeared at one point in his testimony to be basing his recollection on his Sunday routine; and, although he stated at one point only that he "believed" that he "checked on" the patient on that afternoon, he stated elsewhere that he definitely did see her that day.

The evidence to the contrary, though very strong, is not as conclusive as the evidence against a morning visit. Although [p]atient's husband was with Patient A all that afternoon and did not see Dr. Gabaldoni, Dr. Gabaldoni did not claim to have a conversation with Patient A's husband during that afternoon visit. Possibly Dr. Gabaldoni stepped in for a minute at a point where Patient A's husband's attention was briefly diverted elsewhere. Also, although Nurse Ecker testified that she did not see Dr. Gabaldoni in the area after noon, Nurse Ecker, unlike Nurse Gray, did not devote all of her attention solely to Patient A during her shift. Patient A could possibly have forgotten about a very brief visit that took place when she was extremely ill. Since it is possible that an extremely brief visit took place during that afternoon, the Board will not find that such a visit did not take place and will defer to the ALJ's finding that such a visit did take place.

But in regard to the modification to the progress notes made by Dr. Gabaldoni—as they concern the July 9 afternoon visit—the ALJ, impliedly at least, credited those notes as being accurate. The Board disagreed, saying:

The Board also does not accept that the additions made to the record after Patient A's death accurately reflect what occurred during this visit. These additions were made two days after Patient A's death. These additions reflect a much more specific and focused visit than originally recorded for that date. In the additional note, a timed entry (1:00 p.m.) is made, an order to continue H & H (hemoglobin and hematocrit) testing is recorded, and the words "refuses medication" are added.

Dr. Gabaldoni testified that he made these additions from memory and from reviewing the chart. The additional entry says that H & H testing would continue; but this testing was not continued, and no H & H testing was done until 8:00 p.m. on the following day pursuant to a subsequent order phoned in at 7:30 p.m. Nor does the record show anywhere that anyone received or recorded such an order. The order for continued H & H testing, reflected in this note, is not in conformity with the rest of the chart, or with the testimony. *Such an order was not actually issued.* Dr. Gabaldoni's additions regarding H & H testing, thus, certainly did not come from the chart. This addition, therefore, must have come from his memory. His memory was obviously grievously faulty when he recorded that notation. The Board believes that this entire additional notation made after Patient A's death is also most likely the product of a faulty memory. If the visit were long enough to have included a fair explanation of the risks and benefits of a transfusion, Patient A would have remembered it, or Patient A's husband would have seen Dr. Gabaldoni in the room, or Nurse Ecker would have seen Dr. Gabaldoni on the suite, or Dr. Gabaldoni would have noted this contemporaneously in the record, or at least the record *would have indicated some subsequent effort on the part of Dr. Gabaldoni to get Nurse Ecker or the subsequent [n]urse, Nurse Helgren, to try to convince Patient A to take blood.* Nurse Ecker in fact testified that, at 5:15 p.m., she asked Dr. Gabaldoni on the telephone if he was going to give blood and he responded in the negative.

(Emphasis added.)

The finding that the revised progress note concerning the afternoon visit was not accurate is a derivative inference. The Board was more qualified to make that inference than the ALJ because twelve of fifteen Board members are physicians. It is a permissible inference for the Board to make that, if a blood transfusion was, in fact, rejected by a patient and if the doctor's plan was to continue H & H testing, the doctor would have, in fact, immediately ordered that testing. Patient A's

chart shows that thirty and one-half hours elapsed (between 12 noon on July 9 and 7:30 p.m. on July 10) without any additional order for an H & H test.

An additional derivative inference made by the Board was that, if Patient A had indeed refused (on the afternoon of July 9) to have a procedure that she desperately needed, Dr. Gabaldoni would have asked Nurse Ecker and Nurse Horsch to do their best to try to change the patient's mind. Yet, Dr. Gabaldoni waited until the next day, about 8:20 p.m., before he made such a request to any nurse.

As already mentioned, in deciding that Dr. Gabaldoni breached the appropriate standard of care (Breaches F and G), the most important date is July 9. As to that date, we hold that the derivative inferences that the Board made from undisputed facts, coupled with the fact that the ALJ was mistaken when she found that the testimony of Patient A's husband and mother were contradicted by the testimony of Nurses Gray and Ecker, when considered in conjunction with the other reasons set forth by the Board, established strong reasons to believe that Dr. Gabaldoni had not complied with the applicable standard of care on July 9 because he failed, on that date, to advise Patient A of her desperate need for a blood transfusion.

### C. *Morning of July 10, 1995*

Dr. Gabaldoni testified as to what he did on the morning of July 10, and his testimony in this regard was believed by the ALJ. She accurately summarized Dr. Gabaldoni's testimony by saying:

The [r]espondent saw Patient A and her husband around 7:00 a.m. before his office hours. The [r]espondent discussed her possible discharge from the hospital. He informed her that it would impossible for her to go home and recover from her low blood volume on an outpatient basis. The [r]espondent told Patient A her condition was serious, and he could not send her home without a blood transfusion. The [r]espondent told her she needed a transfusion that

morning, but his notes indicate she "refused transfusion." He told her they would talk later in the day.

The [r]espondent's note "refuses transfusion" is sufficient to document that Patient A refused the transfusion.

The Board disagreed, saying:

The credibility question here is similar to that faced by the Board with respect to the morning of July 9. Again, Dr. Gabaldoni's testimony conflicts directly with Patient A's husband's testimony. In this instance, Patient A's husband's testimony is supported by the testimony of Nurses Helgren and Tingle [that they did not see Dr. Gabaldoni in Patient A's room at 7:00 a.m.] and by that of Patient A's mother. The testimony supporting Patient A's husband's version of events with respect to July 10 is not so airtight as the testimony supporting Patient A's husband's testimony with respect to the morning of July 9, 1995. Nevertheless, the Board finds the testimony of Patient A's husband more credible with respect to the 10th also. *By this point in time, it was more unlikely that Dr. Gabaldoni, if he was truly becoming more aware of the urgency of the need for a blood transfusion, would not have mentioned this urgent matter to Nurse Helgren or Nurse Tingle. In addition, Dr. Gabaldoni's credibility with the Board was damaged by his testimony regarding the purported morning visit of the 9th.*

In addition, the records created by Dr. Gabaldoni do not strongly support his testimony on this issue. His original note dated July 10, 1995, did not have a time of day noted. It recorded the lab results (hematocrit) wrong. It purportedly orders H & H testing be done "regularly," but H & H testing was not done until at least 11 hours later, and only in response to a later order called in by Dr. Gabaldoni at 7:30 p.m. No order is found in the chart showing that Dr. Gabaldoni actually ordered anyone to do regular H & H testing, and no one testified to such an order.

Two days after Patient A's death, Dr. Gabaldoni changed the July 10th entry in three ways. First, he added "AM" under the date. Second, he added "consider transfusion at

a later date." Third, after the previous notation of "no dizziness," Dr. Gabaldoni added the words "feels much better."

These additions do not support Dr. Gabaldoni's testimony on this issue. First, these corrections were made from memory and the charts, at the same time as the additions were made to the record of July 9th. Since the July 9th additions included an egregious memory lapse (as discussed above), there is no reason to believe that the changes to July 10th are any more accurate. The added language "consider transfusion at a later date" conflicts somewhat with the original note of "refuses transfusion." And the altered note, which adds the words "feels much better," written long after the patient's death, does not carry much weight with the Board, especially when the author's faulty memory on the other matters is considered. Thus, since neither the documents, nor anyone else's testimony support Dr. Gabaldoni's testimony on this specific issue, the Board concludes that the testimony to the contrary is more credible. The Board will find as a fact that there was no visit by Dr. Gabaldoni to Patient A on the morning of July 10, 1995, and that his additions to the record concerning this issue were erroneous.

(Emphasis added.)

In our view, the Board's reasons for disagreeing with the Administrative Law Judge's findings as to the (alleged) July 10 morning visit are supported by strong reasons. Therefore, under the test enunciated in *Shrieves,* supra, that finding must be accorded deference.

### D. *Afternoon of July 10, 1995*

The ALJ found:

The [r]espondent returned to talk with Patient A after delivering a baby in the afternoon. Her husband was not present and her mother was out in the hall. The [r]espondent informed her she must have 2 units of blood before she could leave the hospital. Patient A told him she would get back to him.

The Board partially disagreed with this finding and concluded as follows:

Dr. Gabaldoni testified that he spoke to Patient A in the afternoon of July 10th while she was in the bathroom. He testified that Patient A's mother was in the hospital but was standing out in the hall at the time. During this conversation in the bathroom or through the bathroom door, Dr. Gabaldoni testified that he told Patient A that she needed two units of blood before she could leave the hospital. According to Dr. Gabaldoni's testimony, Patient A said she would get back to him. Dr. Gabaldoni did not claim that he examined Patient A at this time. He did testify that he did not make any notations about this visit in the record.

Again, giving Dr. Gabaldoni the benefit of the doubt, and in light of the fact that there is no concrete evidence to the contrary, the Board will find that a visit took place on the afternoon of July 10th. This testimony is not directly contradicted by Patient A's husband, since he was out of the hospital from 1:30 p.m. to 5:15 p.m. Patient A's mother, who replaced Patient A's husband at the hospital, testified that she did not see Dr. Gabaldoni—but it is possible she stepped out into the hallway for a moment. *Nurse Tingle, whose shift ran until 7:00 p.m., did not receive any orders or have any conversations with Dr. Gabaldoni about blood or blood transfusions, nor was she aware of Dr. Gabaldoni visiting Patient A,* but it is possible that Dr. Gabaldoni came in for a brief visit without being seen and then left without giving any orders or suggestions to Nurse Tingle regarding blood.

This credibility finding raises the question of what visit, if any, is referred to by Dr. Gabaldoni's hospital note dated July 10, 1995. As previously discussed, an actual morning visit has been ruled out, and the addition of *the "AM" was done much later* and at a time when the accuracy of Dr. Gabaldoni's memory is questionable. This note also repeats the *incorrect hematocrit results found on the July 9th note.* Since no morning visit took place on July 10th, his note does not in fact reflect a morning visit on July 10th; yet Dr.

Gabaldoni denies making any notes of his afternoon visit of July 10, 1995. The Board can only conclude that this note, to the extent that it refers to any visit at all, appears to refer, at least in some respects, to Dr. Gabaldoni's brief visit with Patient A in the afternoon. At the same time, it appears that at least one of the findings recorded here (the incorrect hematocrit finding) seems to have been transferred from the identical incorrect findings recorded on the July 9th note. The exact source of the incorrect data from which this note was constructed is not clear. Fortunately, the Board need not determine the exact etiology of this note in order to resolve this case.

(Emphasis added.)

Later in its opinion, the Board said:

Dr. Gabaldoni may have visited Patient A in the afternoon of July 10th. If so, the visit was extremely brief. In fact, Patient A was in the bathroom, and Dr. Gabaldoni did not examine her. Apparently, he spoke to her through the door. *In any case, this visit was not an adequate visit to inform a patient of the risk of death, if a transfusion is not accepted.* Patient A was by this time in imminent danger of life-threatening complications if she didn't have a blood transfusion. Briefly talking with her while she was in the bathroom is not enough.

(Emphasis added.)

Based on Dr. Gabaldoni's own testimony, the visit on the afternoon of July 10 was brief and very informal. He admitted that during that visit he did not advise Patient A that she was in imminent danger of life-threatening complications if she did not agree to a transfusion. Even if, as the ALJ found, he told Patient A on the afternoon of July 10 "that she could not leave the hospital without a transfusion," this would not meet the standard of care, which, as the Board said, required that Patient A be advised of the risk of death if an immediate transfusion was not accepted. The Board's finding in this regard was not demeanor based but instead was based on the

292

resolution of medical issues which the Board was more qualified to make than the ALJ.

## CONCLUSION

■ Reasonable persons can review the transcript of the ALJ hearing together with Dr. Gabaldoni's progress notes and come to opposite conclusions as to whether Dr. Gabaldoni did, in fact, commit the breaches we have labeled F and G. Although they might each disagree with the final outcome, as the Court of Appeals said in *Snowden v. Mayor & City Council of Baltimore,* 224 Md. 443, 448, 168 A.2d 390 (1961), the test is "reasonableness not rightness". We find that the Board decision was reasonable and hold that the Board based its decision upon substantial evidence.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**