922 A.2d 607

**COMMUNITY CLINIC, INC. et al.**

**v.**

**DEPARTMENT OF HEALTH AND MENTAL HYGIENE et al.**

**No. 2344, Sept. Term, 2005.**

Court of Special Appeals of Maryland.

May 3, 2007.

528

Kathy S. Ghiladi (James L. Feldesman, on brief), Washington, for appellant.

Joel L. Tornari (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel DEBORAH S. EYLER, BARBERA and LAWRENCE F. RODOWSKY, (retired, specially assigned), JJ.

RODOWSKY, J.

In this judicial review of an administrative decision, the appellants, two medical clinics, are aggrieved by the partial disallowance by the appellee, Maryland Department of Health and Mental Hygiene (DHMH), of the appellants' claims for reimbursement of costs under the Maryland Medical Assistance Program (Medicaid or the Program).[1] See Maryland Code (2000, 2005 Repl.Vol.), §§ 15–101(h) and 15–102 of the Health–General Article (HG). The disallowance was based upon DHMH's application of its regulation establishing a monetary cap on a class of costs included in appellants' requests for reimbursement. Appellants contend that the Maryland regulation does not comply with governing federal law. Theoretically, there are four possible outcomes: (1) the regulation is invalid in any application, (2) the regulation is invalid as applied in this case, (3) the regulation is valid as applied in this case, and (4) the regulation is valid in all applications. As explained below, we shall hold that the regulation was validly applied in the instant matter, thereby upholding the DHMH decision.

The appellants are federally-qualified health centers (FQHCs).[2] Appellant, Community Clinic, Inc. (Community or

---

1. In their petition for judicial review, appellants also named as a defendant, S. Anthony McKann, in his official capacity as Secretary of DHMH. We shall consider that there is but one appellee, DHMH.

2. "An FQHC is an entity receiving direct grants from the United States to provide primary and other health care services to 'medically underserved' communities. 42 U.S.C. §§ 254b, 1396d($l$) (2)(B) (2000). In addition to receiving direct grants, an FQHC can also bill for providing Medicare or Medicaid services. See 42 U.S.C. §§ 1395k(a)(2)(D)(ii), 1396a (bb)(2) (2000). This dual funding mechanism allows the FQHC to allocate most of its direct grant dollars towards treating those who lack even Medicare or Medicaid coverage. See H.R.Rep. No. 101–247, at 392–93 (1989), reprinted in 1989 U.S.C.C.A.N. 1906, 2118–19."

CCI), operates in Montgomery County;[3] appellant, People's Community Health Center, Inc. (People's), operates in Baltimore City and northern Anne Arundel County. The fiscal years (July 1–June 30) and amounts of disallowances involved are: CCI: 1996–$108,370; 1997–$123,559; 1998–$32,875; and 1999–$21,624; People's: 1997–$62,612 and 1998–$6,939. The four CCI cases in the Office of Administrative Hearings (OAH) were respectively numbered DHMH–MCP–13–200000011, 13–200000014, 13–200000015, and 13–1200100037. In the OAH, the claims by People's for the years 1997 and 1998 were one appeal, numbered DHMH–MCP–13–200000012.[4]

## General Legal Background

States that elect to participate in Medicaid, as did Maryland, are required to submit to the U.S. Department of Health and Human Services a plan detailing how the state will expend federal funds. 42 U.S.C. § 1396a (1994).[5] That statute, entitled, "State plans for medical assistance," provided in relevant part:

"(a) Contents

"A State plan for medical assistance must—

. . . .

"(13) provide—

---

Community Health Ctr. v. Wilson–Coker, 311 F.3d 132, 134 n. 2 (2d Cir.2002).

3. CCI is described as an FQHC "look-alike." No one argues that this characterization has any bearing on the outcome here.

4. People's also appealed a DHMH disallowance relating to 1999. It was DHMH–MCP–13–200100005 in OAH. The disallowance in that case was based, in part, on the regulation creating a cap for certain types of costs that is involved in the other cases and, in addition, on a different section of the regulations. There was no decision by OAH on that additional issue. Thus, there is no final agency decision in the appeal for 1999 by People's, and that matter is not before us.

5. In this opinion, references to statutes and regulations of the Medicaid Program will be to the provisions as codified at the relevant time, unless otherwise noted.

. . . .

"(E) for payment for services ... under the plan of 100 percent of costs which are reasonable and related to the cost of furnishing such services or based on such other tests of reasonableness, as the Secretary prescribes in regulations ... or, in the case of services to which those regulations do not apply, on the same methodology used under section 1395*l* (a)(3) [relating to Medicare] of this title[.]"

Reasonable, and necessary and proper, costs were defined in 42 C.F.R. § 413.9 (1996) as follows:

"(b) *Definitions*—(1) *Reasonable cost.* Reasonable cost of any services must be determined in accordance with regulations establishing the method or methods to be used, and the items to be included. The regulations in this part take into account both direct and indirect costs of providers of services. The objective is that under the methods of determining costs, the costs with respect to individuals covered by the program will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by the program. These regulations also provide for the making of suitable retroactive adjustments after the provider has submitted fiscal and statistical reports. The retroactive adjustment will represent the difference between the amount received by the provider during the year for covered services from both Medicare and the beneficiaries and the amount determined in accordance with an accepted method of cost apportionment to be the actual cost of services furnished to beneficiaries during the year.

"(2) *Necessary and proper costs.* Necessary and proper costs are costs that are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities. They are usually costs that are common and accepted occurrences in the field of the provider's activity."

As part of its Program, Maryland adopted regulations for FQHCs. 18 Md. R. Issue 7 at 783 *et seq.* (Apr. 5, 1991); 18 Md. R., Issue 13 at 1482 (June 28, 1991). The regulation,

entitled, "Reimbursement Principles for FQHC Services Rendered Before and Including June 30, 1999," is currently codified in COMAR 10.09.08.05.C. As relevant to the issue before us, that regulation provides that

"federally qualified health centers shall be paid 100 percent of their reasonable allowable costs, subject to the limitations contained in § C(4)-(7) of this regulation, that are related to the provision of covered services."

Reimbursement of FQHCs is on a per visit basis. Reimbursement during a fiscal year is based on an interim per visit rate, with a final per visit rate determined for the entire year. § C(4)(a), (b), and (c). The regulation further requires that an FQHC's costs be divided into four categories, called "centers." These are general service costs, primary care services costs, dental services costs, if applicable, and non-reimbursable costs. § C(4)(e). The instant matter concerns the "[g]eneral service cost center" which

"is composed of those costs associated with the depreciation of the facility's building or buildings and equipment, the operation of the plant, the administration and management of the facility, medical records, and those administrative costs associated with pharmacy and EPSDT services which are not reimbursed under a different payment methodology[.]"

§ C(4)(e)(i). The parties have adopted "administrative costs" as the shorthand reference to this cost center.

The regulation distinguishes between urban and rural clinics. § C(5)(a) and (b). Appellants' clinics are classified as urban. The disallowances at issue here result from the application of COMAR 10.09.08.05.C(5)(d)(i) (the Cap), which in relevant part provides:

"(d) Within each area a rate shall be developed for primary care ... using the following method:

"(i) Based on the provider's cost report for the fiscal year end which falls in the calendar year immediately preceding the year in which the rate year begins and other available relevant data, calculate a per visit rate for primary care

services.... *In calculating these rates, the amount of general service cost center costs that are eligible for reimbursement is the lesser of the allowable general service costs shown on the cost report or the amount that results from multiplying the provider's total adjusted costs by 33 1/3 percent.*"

(Emphasis added).

## OAH Proceedings

The Secretary of DHMH referred appellants' appeal of the disallowances to OAH in order to have an administrative law judge (ALJ) take testimony and make a recommended decision. *See* COMAR 10.01.03.07. Each of the parties moved for a summary decision before the ALJ. In support of its motions, DHMH furnished the materials described below.

I. A letter dated May 8, 1995, from the U.S. Department of Health and Human Services, Health Care Financing Administration (HCFA) (now the Centers for Medicare and Medicaid Service) to State Medical Directors, responding to "numerous inquiries ... concerning the application of limits on the payment of [FQHCs]." The federal administrator said in part, "[T]he State agency must: 1) determine and assure its system is based upon, and covers, the reasonable costs of providing FQHC (core) and other ambulatory services to Medicaid recipients[.]" The letter also said that

"the payment requirements [in the federal Medicaid statute and in the State Medicaid Manual] do not, in any way, preclude States (when determining reasonable cost) from establishing limits on the direct and indirect costs of furnishing covered services under the FQHC benefit. Limits on indirect costs are permissible as long as the State appropriately defines and identifies these costs."

II. A copy of 42 C.F.R. § 405.2468(d)(1), which recognizes that costs in excess of guideline amounts are not included in costs allowable for reimbursement "unless the clinic or center provides reasonable justification[.]" 42 C.F.R. § 405.2468 is

included in a subpart of the HCFA regulations dealing with FQHCs.

III. A copy of § 6303 of the State Medicaid Manual which directs:

"Pay 100 percent of the costs which are reasonable.... *Irrespective of the type of payment method utilized, the State must determine and assure that the payments are based upon, and cover, the reasonable costs of providing services to Medicaid beneficiaries.* Such costs cannot exceed the reasonable costs as determined by the applicable Medicare cost reimbursement principles set forth in 42 C.F.R. Part 413."

IV. An affidavit by a DHMH official affirming that, in 1990, a committee composed of the Maryland Medicaid staff and representatives of FQHCs developed a cost report and that, as part of that process, the Medicaid staff proposed the Cap.

V. A copy of the Maryland Medicaid Plan, as proposed, together with correspondence relating to its ultimate federal approval in September 1991.

VI. An affidavit by a DHMH official stating that the Medicaid programs of five other states "have included in their State plans caps on administrative costs," at levels of 30 percent and, in one instance, 40 percent of total eligible costs.

In their motions for summary decision, appellants relied on the federal requirement for 100 percent reimbursement of reasonable, allowable costs and on their cost reports. They argued:

"Federal cost principles applicable to FQHC costs under Medicaid do not allow a State to adopt an administrative cap such as Maryland's. The findings called for in HCFA's May 8, 1995 policy guidance to State Medicaid Directors were never made (and the State therefore cannot make the requisite assurances)."

The ALJ denied all of the motions. She reasoned, in part, that the review of Maryland's plan by HCFA, which she

characterized as *"pro forma,"* was not dispositive, on summary decision, that the Cap complied with the federal reasonableness requirement. With respect to the appellants' motions, the ALJ concluded that they had "to prove by a preponderance of the evidence that the cap, as applied, results in the FQHC not being reimbursed 100 percent of the costs which are reasonable and related to the cost of furnishing services to its Medical Assistance clients."

The claims for reimbursement went to a hearing on the merits before the ALJ. Appellants produced witnesses who described the preparation of their cost reports and the oversight rendered by their auditors and boards of directors. Appellants also explained the salaries of their highest paid employees by reference to the difficulty faced in obtaining qualified people. DHMH did not present any testimony or documentary evidence. Instead, it asked the ALJ to take judicial notice of certain regulations and of sections of the Medicaid Provider Reimbursement Manual. Thereupon, DHMH moved for the ALJ "to dismiss" appellants' appeals on the merits. In a written opinion, she denied DHMH's motion to dismiss.

The ALJ made findings of fact in each of the appeals. In the CCI case, the principal findings are set forth below (transcript references omitted):

"6. The largest part of Community's administrative costs is its salaries and expenses related to operating its centers (rent and utilities).

"7. Each Community center has a patient waiting room which is the largest space in each of its centers....

"8. Patient waiting rooms, as well as patient bathrooms, medical records rooms and the doctor's offices (but not examining rooms) were all classified under administrative costs (and therefore subject to the cap on administrative expenses) by DHMH's designee.

"9. Salaries are developed and reviewed by the senior staff at Community (Executive Director, Medical Director, Director of Operations, Director of Finance).

The salaries are then reviewed and approved by the Board of Directors.

"10. The position of Medical Director at Community became open three times during the cost years at issue. At one time the position of Medical Director was open for eight months.

"11. A background in public health is preferred for the position of Medical Director.

"12. One candidate for Medical Director during the cost years at issue rejected Community's offer of the position due to the salary being offered. Approximately six other individuals were not considered for the position after salary was discussed as part of the interviewing process.

"13. The Executive Director tries to gauge what salaries are being offered by other non-profit health care centers by talking with his peers. The Executive Director is also aware of salary reviews conducted by the for-profit sector (by groups such as Medical Group Management Association) but these reviews are not a good indication of the salaries in the nonprofit sector.

"14. Community seeks to employ physicians who are bilingual but is not always successful because bilingual physicians can command a higher salary than Community can afford to pay.

"15. Physicians have left Community for positions with Kaiser or as an associate in a private practice because those positions provide better benefits and a higher salary.

"16. The position of Director of Finance became open two times during the cost years at issue. Five candidates for Director of Finance rejected Community's offer of the position due to the salary being offered.

"17. Community formerly employed nurse managers but no longer employs nurses, as it can not afford to pay the higher salaries. Instead, Community relies on

medical assistants who work under the direct supervision of a physician and are trained in phlebotomy, taking vital signs, and administering immunizations.

"18. A national model used by non-profit health centers employs two medical assistants per physician, a patient representative (receptionist) and a manager. Community has at least one physician at each center but if a center has more than one physician the center does not increase the number of medical assistants.

"19. The cost reports submitted by Community for the years in question are prepared from Community's Financial Statement which is based on its records (salary records, invoices and expense records, etc.) which are maintained by Community using the accrual basis of accounting.

"20. These records (salary records, invoices and expense records) are also used by Community to produce an audited Financial Statement.

"21. An A–133 Report is required from all State, local governments and non-profit organizations which expend more than $300,000 per year in federal funding; these audits fall within the purview of the Office of Budget and Management.

"22. Because Community expends more than $300,000 in federal funding, it must retain the services of an outside auditor to prepare the A–133 Report.

"23. The outside auditor uses Community's Financial Statement in preparing the A–133 Report. In preparing the A–133 Report, the outside auditor does not review Medicaid methodology regulations or consider Medicare cost reimbursement principles. Medicare and Medicaid payments are not considered Federal awards subject to an A–133 report."

In the People's case, the ALJ found facts as follows (transcript references omitted):

"3. The Federal Bureau of Primary Health Care (BPHC) issues program expectations which are a series of guidelines that People's Board and staff must follow and a series of required services that must be provided.

"4. Every three years People's is evaluated by the BPHC, which sends three outside experts to review People's performance in the areas of administrative, clinical, fiscal and MIS operations. This review is called the Primary Care Effectiveness Review.

"5. As part of the Primary Care Effectiveness Review, People's must prove to BPHC how it sets its salary structure.

"6. People's performs salary comparability studies using data from the Maryland Association of Nonprofits and the National Association of Community Health Centers. The Executive Director has studied every position at People's (including file clerks) and also obtained information on salaries by talking with her peers.

"7. The Executive Director and the Chief Financial Officer gather data concerning salaries and reviews it with the personnel committee of the Board of Directors which makes the final decision on the salary structure.

"8. The Board of Directors reviews and approves People's budget on an annual basis.

"9. People's federal grant documents must include a global budget which shows every revenue source and every expense, including Medicaid revenue and anticipated Medicaid revenue.

"10. Two of People's health centers are located in high crime areas in Baltimore City.

"11. People's did not have to pay rent until 1999 when it acquired a practice in the Govans Community.

"12. The largest part of People's administrative costs is its salaries. The second largest expense is the cost of operating the buildings."

The ALJ's findings Nos. 13 through 17 in the People's appeal are identical with findings Nos. 19 through 23 in the CCI appeal.

In her conclusions of law, the ALJ placed considerable emphasis on the discussion of reasonable costs in the Medicare Provider Reimbursement Manual, Part I, § 2102.1 by quoting, *inter alia,* the following:

" 'It is the intent of the program that providers will be reimbursed **the actual costs of providing high quality care, regardless of how widely they may vary from provider to provider except where a particular institution's costs are found to be substantially out of line with other institutions in the same area which are similar in size, scope of services, utilization and other relevant factors.**

. . . .

" '[Reasonable costs] do not exceed what a prudent and cost-conscious buyer pays for a given item or service[.]' "

Applying the above-quoted standards, the ALJ found, in each appeal, that the appellant had shown that its costs were reasonable, because the Clinic was subjected to both internal and external checks on its fiscal practices, and there was no evidence of self-dealing or of any incentive to pay excessive salaries or rent. The ALJ reasoned, in part, that "[t]here was no evidence presented, either through cross examination of the witnesses on behalf of the Appellant or through documents or witnesses for DHMH, that any of [appellants'] costs were 'substantially out of line.' "

In each case, the ALJ concluded:

"DHMH provided no evidence that it analyzed comparable not-for-profit health centers (or for-profit institutions) in setting its mathematical formula at 33 and 1/3 percent. Despite DHMH's assertions that the purpose of the cap is to promote efficiency, I am left with the inescapable conclusion that if [the FQHC] somehow managed to cut its

administrative costs in half, the administrative cap would be nevertheless be [sic] applied exactly as it was in the cost reports at issue in this appeal. The application of a strict mathematical formula, without any analysis of what constitutes an efficiently operated health center and how the cap achieves that result, is inconsistent with the reasonableness requirements of Federal law. [The FQHC] has persuasively demonstrated a nexus between the cap and not being reimbursed 100 percent of the costs that are reasonable and related to the cost of furnishing services to its Medical Assistance clients. Therefore, Maryland's regulation providing for the administrative cap, *as applied in this case[,]* conflicts with Federal law and is arbitrary and capricious."

(Emphasis added).

The ALJ prepared recommended orders which summarized the arguments and conclusions of law. She reiterated her conclusion, made when ruling on the cross motions for summary decision, "that federal law does not prohibit DHMH from instituting a cap on administrative expenses." The ALJ further reiterated her conclusion that "Maryland's regulation providing for an administrative cap, as applied in this case, conflicted with [f]ederal law[.]"

### The Secretary's Decision[6]

DHMH excepted to the ALJ's recommended order that the disputed claims for reimbursement be paid. Appellants filed no exceptions. DHMH took the following exceptions:

"(1) The ALJ's legal conclusion that the 33 1/3 percent administrative cap was not reasonable on its face is clearly erroneous.[7]

---

6. For brevity's sake, we refer to the Secretary, although the decision at that level was rendered by a designee of the Secretary.

7. We are perplexed by this exception, in relation to the ALJ's rationale. The exception apparently represents DHMH's conclusion from the denial of its motion for summary decision. Yet, in the section of its exceptions dealing with the procedural history of the appellants' cases,

"(2) The ALJ's ruling that Community met its burden and proved . . . that the imposition of the administrative cap caused it to receive less than 100 percent of its reasonable costs for the cost years at issue is not supported by the evidence.

"(3) The ALJ's legal conclusion that Community demonstrated that the regulation providing for an administrative cap, as applied, conflicts with [f]ederal law, is clearly erroneous."

The Secretary of DHMH rejected the ALJ's conclusion that the disallowed costs should be reimbursed. The Secretary expressly adopted the findings of fact that the ALJ had made on the cross motions for summary decision, but the Secretary declined to adopt the ALJ's reasoning and legal conclusions. With respect to the DHMH exception that assumed that the ALJ had concluded that the Cap was not reasonable on its face, the Secretary ruled that there was ample evidence supporting the reasonableness of the Cap. As evidence, the Secretary pointed to the materials that had been presented by DHMH in support of its motion for summary decision, namely, the public process in the adoption of the Cap, federal approval of the Program, and the utilization of relatively comparable caps in five other states. In addition, the Secretary pointed to a cap, utilized in the Program, on the reimbursable costs of managed care organizations.

With respect to the ALJ's conclusion that the Cap, under federal law, was invalidly applied in the instant cases, the Secretary ruled that the appellants "did not establish that their claimed administrative costs were reasonable." Although the Secretary accepted the testimony of appellants' witnesses, their testimony "did not demonstrate, as the ALJ concluded, that it was reasonable and necessary for the [appellants] to incur administrative expenses in excess of one-third of their total adjusted patient care-related expenditures in order to provide . . . quality care." The appellants, in the

---

DHMH said that the ALJ "did not rule, however, that the cap was unreasonable on its face."

Secretary's opinion, did not accomplish their burden of proving, with specificity, the reasonableness of their costs because they did not present "evidence regarding administrative costs among FQHCs in general. They could have introduced salary studies or analyses of local rental costs for space similar to that needed by comparable FQHCs." Appellants presented no specific evidence that "the range of [their] administrative costs across cost years was in line with other providers or consistent with cost-conscious purchasing."

## The Board of Review

Appellants appealed from the Secretary to the Board of Review of DHMH (the Board). After reviewing the record and hearing oral argument from the parties, the Board affirmed the Secretary, without further explanation. Under these circumstances, we consider that the Board's decision was based upon the same rationale as that articulated by the Secretary, and we shall refer hereinafter to the Secretary's ruling. The Board's action constituted the final agency decision for purposes of judicial review under the Administrative Procedure Act. HG § 2–207(f)(2).

## Circuit Court Review

Appellants petitioned for judicial review in the Circuit Court for Montgomery County. Their petition alleged that the ALJ had concluded that the Cap conflicted with "federal law and was otherwise arbitrary and capricious." They referred only to DHMH's exception raising the issue of whether the Cap "conflicted with requirements of federal law[.]" Appellants asked the circuit court to declare the Cap invalid.[8] Appellants further sought an order reversing the Secretary's decision and

---

8. In this prayer for relief, appellants invoked Maryland Code (1984, 2004 Repl.Vol.), § 10–125 of the State Government Article. That section, in part, provides: "A person may file a petition for a declaratory judgment on the validity of any regulation, whether or not the person has asked the unit to consider the validity of the regulation." § 10–125(a)(1).

directing computation of their reimbursable costs without applying the Cap.

The court, after simply noting that the Board's decision was supported by substantial evidence, affirmed the Board. This appeal followed.

## Appellants' Arguments

From appellants' brief in this Court, we distill that they advance the following arguments:

I. The circuit court erred in applying a substantial evidence test.

II. The Secretary erred in not accepting the ALJ's conclusions of law, after accepting the ALJ's findings of fact.

In this connection, appellants argue that the "sole consideration before DHMH [when adopting the Cap] was cost savings." They put aside, as irrelevant, the public process in adopting the Cap, the use of caps for reimbursement of other types of Medicaid providers, and the federal approval of the Program. They submit that evidence of cost limits imposed by other states did not "[a]lleviate DHMH of [p]erforming [i]ts [o]wn [a]nalysis."

III. "[D]HMH Never Examined the Limits at Issue to Determine Whether They Unlawfully Curtailed the Health Centers' Reasonable Costs."

In an argument consisting of exactly eight lines in their brief, appellants assert that DHMH was required, by general administrative law principles and by the HCFA advice to State Medicaid Directors of May 8, 1995, to have performed an analysis before it could assert that costs in excess of the Cap were unreasonable.

We shall consider these arguments against the framework of the four theoretically possible outcomes with which we introduced this opinion.

### Is the Cap Invalid Under All Circumstances?

The ALJ did not recommend deciding that the Cap was invalid under all circumstances; she recommended deciding that it was invalid as applied to appellants. Although DHMH was not aggrieved by any holding of *per se* invalidity, it included that issue in its exceptions. Apparently out of an abundance of caution, the Secretary opined on the facial validity of the Cap. We shall assume that the raising of the issue of *per se* invalidity by DHMH inured to the benefit of appellants, who thereby were entitled to assert *per se* invalidity before the Board, the circuit court, and in this Court.

At oral argument in this Court, in response to questions from the Court, appellants denied that they contend that federal law precluded use of a cap on reimbursement of costs claimed under a Medicaid program, and they denied that they contend that Maryland's having fixed its cap on administrative expenses at 33–1/3% was precluded by federal law. Thus, it appears that appellants' position for *per se* invalidity of the Cap is to be found in their argument III, *supra, i.e.,* that DHMH did not demonstrate that it performed an analysis of costs when adopting the Cap.

In essence, appellants contend that any allowable type of administrative cost, actually incurred, is reasonable, unless DHMH can prove that administrative costs in excess of 33–1/3% of total costs are always unreasonable. Phrased another way, appellants contend that Maryland could not cap administrative expenses at a fixed percentage of total allowable costs unless it first had undertaken a study demonstrating that administrative costs above the chosen percentage are always unreasonable.

■ The record reflects that the Cap was adopted in accordance with the Maryland Administrative Procedure Act and that it was approved by HCFA as complying with federal law. Consequently, the Cap is presumed to be valid, and the burden is upon appellants to demonstrate its invalidity. In Maryland, the test for determining the validity of the adoption of a regulation is whether it contradicts the language or

purpose of the statute authorizing the regulation. *See Comptroller of the Treasury v. Citicorp Int'l Communications, Inc.*, 389 Md. 156, 180, 884 A.2d 112, 126 (2005) (citing *Lussier v. Maryland Racing Comm'n*, 343 Md. 681, 684 A.2d 804 (1996)).

Appellants do not direct our attention to any federal or Maryland statute that required DHMH to undergird or document its conclusion, pegging the Cap at 33–1/3% of total costs, in order for the regulation to conform to governing statutes. Instead, appellants refer us to *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), where the Court held to be arbitrary and capricious the rescission by the U.S. Secretary of Transportation of a National Highway Traffic Safety Administration standard, that would have required manufacturers to equip motor vehicles with passive restraints (automatic seat belts) or airbags. The governing statutory criteria in that case expressly required consideration by the Secretary of " 'relevant available motor vehicle safety data,' " *id.* at 33, 103 S.Ct. at 2862, but the record demonstrated that the rescission reflected "a change in plans by the automobile industry." *Id.* at 38, 103 S.Ct. at 2864.

As representing federal law, appellants point to the May 8, 1995 HCFA communication to State Medical Directors. Presumably appellants rely on that portion of the communication advising that "the State agency must: 1) determine and assure its system is based upon, and covers, the reasonable costs of providing FQHC" services. That communication, however, further states that "State agencies are free to establish and apply their own tests of efficiency and economy when paying FQHCs, as long as the requirements contained in section 6303 of the State Medicaid Manual. . . . are met." The May 8, 1995 document also expressly recognized that "costs containment mechanisms (i.e., caps and screens)" were permissible. This communication does not demonstrate a federal requirement that a state must conduct an economic survey in order to avoid *per se* invalidity of a cap under federal law.

■ Consistent with both of the bases touched in the federal directive, we hold that the federal requirement for state reimbursement of 100% of an FQHC's reasonable cost is satisfied by a state system that affords an FQHC the opportunity to demonstrate that its costs, albeit in excess of a cap, are reasonable.

### Is the Cap Valid as Applied in this Case?

■ Whether the Cap was validly applied in the instant matter is the issue generated by appellants' argument II, that the Secretary erred in rejecting the ALJ's conclusions, after having accepted the ALJ's findings of fact. Based on the specific findings of fact which we have set forth, *supra,* the ALJ concluded that appellants' administrative costs, in excess of the Cap, were reasonable. The latter is either a conclusion of law, a mixed question of fact and law, or a question of fact. Assuming, most favorably to appellants, that reasonableness in this case is a question of fact, that determination is, nevertheless, a matter of inference to be drawn from all of the primary facts in the record. Where, as here, a hearing officer and the final decision-maker in an agency differ with respect to a question of fact, Maryland cases recognize a distinction between credibility-based determinations of fact and inferences drawn from primary facts.

■ Judge Motz (now a judge of the United States Court of Appeals for the Fourth Judicial Circuit), writing for this Court in *Department of Health & Mental Hygiene v. Shrieves,* 100 Md.App. 283, 641 A.2d 899 (1994), clearly articulated the distinction.

> "[W]hen an administrative agency overrules the recommendation of an ALJ, a reviewing court's task is to determine if the agency's final order is based on substantial evidence in the record. In making this judgment, the ALJ's findings are, of course, part of the record and are to be considered along with the other portions of the record. Moreover, where credibility is pivotal to the agency's final order, ALJ's findings based on the demeanor of witnesses are entitled to

substantial deference and can be rejected by the agency only if it gives strong reasons for doing so. If, however, after giving appropriate deference to the ALJ's demeanor-based findings there is sufficient evidence in the record to support both the decision of the ALJ and that of the agency, the agency's final order is to be affirmed—even if a court might have reached the opposite conclusion. This approach preserves the rightful roles of the ALJ, the agency, and the reviewing court: it gives special deference to both the ALJ's demeanor-based credibility determinations and to the agency's authority in making other factual findings and properly limits the role of the reviewing court."

*Id.* at 302–03, 641 A.2d at 908–09. *See also Universal Camera Corp. v. National Labor Relations Bd.,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Consumer Prot. Div. v. Morgan,* 387 Md. 125, 196–203, 874 A.2d 919, 961–65 (2005); *Anderson v. Department of Pub. Safety & Corr. Servs.,* 330 Md. 187, 623 A.2d 198 (1993).

In *Shrieves,* we quoted favorably from *Penasquitos Village, Inc. v. National Labor Relations Bd.,* 565 F.2d 1074 (9th Cir.1977), where the distinction was expressed in terms of an ALJ's testimonial inferences as compared with an agency's derivative inferences. We said:

" 'Weight is given the administrative law judge's determinations of credibility for the obvious reason that he or she sees the witnesses and hears them testify, while the Board and the reviewing court look only at cold records. All aspects of the witness's demeanor—including the expression of his countenance, how he sits or stands, whether he is inordinately nervous, his coloration during critical examination, the modulation or pace of his speech and other non-verbal communication—may convince the observing trial judge that the witness is testifying truthfully or falsely. These same very important factors, however, are entirely unavailable to a reader of the transcript, such as [an agency or reviewing court]. But it should be noted that the administrative law judge's opportunity to observe the witnesses' demeanor does not, by itself, require deference with regard

to his or her derivative inferences. Observation makes weighty only the observer's testimonial inferences.

" 'Deference is accorded [an agency's] factual conclusions for a different reason—[the agency is] presumed to have broad experience and expertise in [the area].... Further, it is the [agency] to which [the legislature] has delegated administration of the [statute]. The [agency], therefore, is viewed as particularly capable of drawing inferences from the facts.... Accordingly, ... a [reviewing court] must abide by the [agency's] derivative inferences, if drawn from not discredited testimony, unless those inferences are irrational, ... tenuous or unwarranted.... As already noted, however, the [agency], as a reviewing body, has little or no basis for disputing an administrative law judge's testimonial inferences.' "

*Shrieves,* 100 Md.App. at 300, 641 A.2d at 907 (quoting *Penasquitos Village,* 565 F.2d at 1078–79 (internal quotations and citations omitted)).

Consequently, in the instant matter, the Secretary was not restrained by the recommended conclusion drawn by the ALJ; rather, the Secretary was free to make the determinative inference, based on the entire record, that the excess costs were unreasonable, if that inference was supported by substantial evidence.

## Is the Secretary's Decision Supported by Substantial Evidence?

As demonstrated above, the legal issue before us is whether the Secretary's decision is supported by substantial evidence. Thus, appellants' argument I, that the circuit court erred by applying a substantial evidence test, misses the mark.

The Secretary's finding that appellants' administrative costs, in excess of 33–1/3% of total costs, were unreasonable is supported by the presumption of unreasonableness created by the validly adopted Cap regulation, by the approval of that presumption by federal authorities, and by the recognition of

the unreasonableness of excess costs implicit in other states' adoptions of comparable caps on administrative expenses. Phrased another way, the Secretary did not act arbitrarily or capriciously in declining to draw the inference (which likewise may have been supported by substantial evidence) that appellants' costs were reasonable. Nor did the Secretary act arbitrarily in concluding that appellants' primary evidence, due to the absence of specific comparisons to administrative costs of other FQHCs, did not persuade him that appellants' administrative costs, in excess of the Cap, were reasonable.

Thus, it is unnecessary to decide if the Cap is a valid conclusive presumption.

For all the foregoing reasons, we shall affirm.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED.**

**COSTS TO BE PAID BY THE APPELLANTS.**